UNITED CONSTRUCTION WORKERS ET AL. *v.*
LABURNUM CONSTRUCTION CORP.

No. 188.   Argued April 5, 1954.—Decided June 7, 1954.

*M. E. Boiarsky* argued the cause for petitioners. With him on the brief were *Welly K. Hopkins, Harrison Combs* and *Willard P. Owens.*

*Archibald G. Robertson* and *George E. Allen* argued the cause for respondent. With them on the brief were *Francis V. Lowden, Jr.* and *T. Justin Moore, Jr.*

*Solicitor General Sobeloff* and *George J. Bott* filed a memorandum for the National Labor Relations Board in response to the invitation of the Court (346 U. S. 936).

MR. JUSTICE BURTON delivered the opinion of the Court.

The question before us is whether the Labor Management Relations Act, 1947,[1] has given the National Labor Relations Board such exclusive jurisdiction over the subject matter of a common-law tort action for damages as to preclude an appropriate state court from hearing and determining its issues where such conduct constitutes an unfair labor practice under that Act. For the reasons hereafter stated, we hold that it has not.

November 16, 1949, Laburnum Construction Corporation, a Virginia corporation, respondent herein, filed a notice of motion for judgment in the Circuit Court of the City of Richmond, Virginia, against petitioners United Construction Workers, affiliated with United Mine Workers of America; District 50, United Mine Workers of America; and United Mine Workers of America. The proceeding was a common-law tort action for compensatory and punitive damages totaling $500,000. The notice contained substantially the following allegations: While respondent was performing construction work in Breathitt County, Kentucky, under contracts with Pond Creek Pocahontas Company and others, July

---

[1] 61 Stat. 136 *et seq.*, 29 U. S. C. (1952 ed.) § 141 *et seq.*

26–August 4, 1949, agents of the respective petitioners came there. They demanded that respondent's employees join the United Construction Workers and that respondent recognize that organization as the sole bargaining agent for respondent's employees on the project. They added that, if respondent and its employees did not comply, respondent would not be allowed to continue its work. Upon respondent's refusal and that of many of its employees to yield to such demands, petitioners' agents threatened and intimidated respondent's officers and employees with violence to such a degree that respondent was compelled to abandon all its projects in that area. The notice further alleged that, as the result of this conduct of petitioners' agents, respondent was deprived of substantial profits it otherwise would have earned on those and other projects. After trial, a jury found petitioners jointly and severally liable to respondent for $175,437.19 as compensatory damages, and $100,-000 as punitive damages, making a total of $275,437.19.

Petitioners moved for a new trial claiming numerous errors of law, and for a dismissal on the ground that the Labor Management Relations Act had deprived the court of its jurisdiction over the subject matter. Both motions were overruled and the Supreme Court of Appeals of Virginia granted a writ of error and supersedeas. After argument, it struck out $146,111.10 of the compensatory damages and affirmed the judgment for the remaining $129,326.09. 194 Va. 872, 75 S. E. 2d 694. Because of the importance of the jurisdictional issue to the enforcement of common-law rights and to the administration of the Labor Management Relations Act, we granted certiorari limited to the following question:

> " 'In view of the type of conduct found by the Supreme Court of Appeals of Virginia to have been carried out by Petitioners, does the National Labor

Relations Board have exclusive jurisdiction over the subject matter so as to preclude the State Court from hearing and determining the issues in a common-law tort action based upon this conduct?' " 346 U. S. 936.[2]

We are concerned only with the above-stated jurisdictional question. We accept the view of the National Labor Relations Board that respondent's activities affect interstate commerce within the meaning of the Labor Management Relations Act.[3] The "type of conduct found by the Supreme Court of Appeals of Virginia" is

---

[2] Our order also stated that—

"The Government is invited to submit a memorandum setting forth the policy of the National Labor Relations Board in regard to: (1) the proviso in § 10 (a), 61 Stat. 146, 29 U. S. C. (Supp. III) § 160 (a); and (2) other cases, apart from those in § 10 (a), in which the Board declines to exercise its statutory jurisdiction. The memorandum should indicate by what standards the Board declines to act and whether the standards are applied by rule or regulation or on a case-by-case method."

The Government filed a memorandum stating that it had found it "not feasible under the limitations prescribed by the Act to consummate agreements ceding jurisdiction" under the proviso in § 10 (a). It stated also that "Under the standards which the Board is currently continuing to apply, it would assert jurisdiction over an enterprise similar to [that of] respondent company herein." It found that respondent's enterprises came within at least the following categories of the Board's jurisdictional standards:

"4. Enterprises producing or handling goods destined for out-of-State shipment, or performing services outside the State in which the firm is located, valued at $25,000 a year.

"5. Enterprises furnishing goods or services of $50,000 a year or more to concerns in categories 1, 2, or 4 [*supra*]."

See also, Mimeograph Release of National Labor Relations Board, dated October 6, 1950, entitled "N. L. R. B. Clarifies and Defines Areas In Which It Will and Will Not Exercise Jurisdiction"; *Labor Board* v. *Denver Building Council*, 341 U. S. 675, 684–685.

[3] See note 2, *supra*.

set out in the margin.[4]    Although the notice for judgment
does not mention the Labor Management Relations Act
or unfair labor practices as such, we assume the conduct

[4] "During the period from September 6, 1947 to December 1,
1949, the plaintiff performed work in West Virginia and Kentucky
for Pond Creek Pocahontas Company, Island Creek Coal Company,
and their subsidiary companies, under twelve separate contracts
amounting to more than $650,000, from which it derived an annual
profit slightly over $25,000. . . .

.            .            .            .            .

"In October, 1948, the two coal-producing companies determined
to open a mine in Breathitt county, Kentucky, and Bryan [president
of respondent] was asked to undertake the building of the prepara-
tion plant there.   Because of the undeveloped condition of the roads
and lack of living accommodations for the laborers, Bryan was told
that if Laburnum would undertake the project it would be awarded
additional work which would be required for the operation of another
mine in Breathitt county, amounting to more than $600,000, on the
basis of cost plus a fee of five per cent.

"On October 28, 1948, Pond Creek Pocahontas Company awarded
the plaintiff a contract for construction of the preparation plant on
the basis of cost plus a fee of five per cent, the total fee not to exceed
the sum of $12,000.   The estimated cost of the project was $200,000.
Work on this project was commenced November 1, 1948, and was
approximately ninety-five per cent completed when it was interrupted
on July 26, 1949.   Pursuant to their agreement the coal companies
also awarded Laburnum several projects included in the additional
work to which reference has been made.

"Upon commencing the work in Breathitt county, Laburnum, in
compliance with its agreement with Richmond Building & Construc-
tion Trades Council, procured skilled laborers through the nearest
local affiliates of the American Federation of Labor.   With the knowl-
edge and consent of these affiliates it employed local unskilled laborers
who were not members of any labor organization.

"Laburnum proceeded with its work on these several projects with-
out trouble until July 14, 1949, when William O. Hart, speaking from
Pikeville, Kentucky, telephoned Bryan who was in Richmond.   Ac-
cording to the testimony of Bryan, which was accepted by the jury,
Hart identified himself as a 'field representative of the United Con-
struction Workers and District 50 of the United Mine Workers of
America,' working under David Hunter, 'Regional Director of Region
58 of United Construction Workers and District 50,' with head-

before us also constituted an unfair labor practice within the following provisions of that Act:

"SEC. 8. . . .

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: . . . ."

---

quarters in Pikeville. Hart told Bryan that he was familiar with the work which Laburnum was doing and about to do in Breathitt county, that the plaintiff was 'working in United Mine Workers territory,' and that he (Hart) would close down this work unless the plaintiff recognized the United Construction Workers in the employment of its workers. Bryan told Hart of Laburnum's agreement with the American Federation of Labor affiliate at Richmond, under which it was to employ members of that union, and that consequently it would not be able to comply with Hart's demand and make an agreement with the United Construction Workers. Hart replied that he was going 'to take over' the plaintiff's work, that he intended to 'organize' all of its workers, 'including the carpenters, electricians, pipefitters, ironworkers, millwrights, laborers, and everybody else,' and that if the plaintiff failed to make an agreement 'recognizing the United Construction Workers, he (Hart) would close down' all of the plaintiff's work in Breathitt county, as had been done in other instances within his (Hart's) territory.

.        .        .        .

"On Monday, July 25, about 7:30 p. m., Delinger [in respondent's employ] telephoned Bryan that he had been informed that on the next day, at noon, the United Construction Workers were coming to the job site with a large group of men, that they would be armed, and would stop the plaintiff's employees from working on the projects.

.        .        .        .        .

". . . When he [Bryan] arrived there [July 26] he found that all work on the several projects in which his men were engaged had stopped. It developed that about noon on that day Hart had arrived at the job site accompanied by a crowd variously estimated at from 40 to 150 men. There is evidence that this was 'a very rough, boisterous crowd,' that some of the men used abusive language, that some were drunk, and that some carried guns and knives.

.        .        .        .        .

"Hart and his men went to the coal preparation plant and told the

61 Stat. 140, 141, 29 U. S. C. (1952 ed.) § 158 (b)
(1) (A).

"SEC. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives

---

Laburnum workers there that he was taking over the job and that the Laburnum workers would have to 'join up with the United Construction Workers.' He accosted other employees of the plaintiff at another site where he repeated his threats that he would 'take over' the job unless they joined the union which he represented. Some of the plaintiff's employees yielded to these threats and agreed to join Hart's labor organization, while others refused to do so.

. . . . .

"Bryan talked with Hart again at the job site on August 1, and, as he says, Hart 'left no doubt in anybody's mind that he was going to have people to stop any men from working who tried.' 'He continually threatened to bring a large crowd of people there from Beaver Creek and other places to stop us from working if any of our people went to work. He said he would do that unless we signed a paper recognizing his organization as the representative of the laborers.' Bryan replied that he 'wouldn't do it and couldn't do it' because of his prior obligation to another labor organization. Moreover, Hart threatened that if the Laburnum men 'went back to work he was going to close down the mine operations by stopping the United Mine Workers from working for Pond Creek.'

". . . Consequently, on August 4, the coal companies, because of the dispute in which the plaintiff had become involved with representatives of these labor organizations, canceled the construction contracts with Laburnum which were then in progress.

. . . . .

"After the violent events of July, 1949, Pond Creek Pocahontas Company and Island Creek Coal Company abandoned the award of the additional work upon a cost plus five per cent basis which they had promised the Laburnum company. The coal companies invited bids upon this proposed construction, but Laburnum was unsuccessful in all of its bids for such work. The officials of the coal companies expressed their high regard and sympathy for Bryan, but explained that they could not run the risk of having the defendant unions shut down the mining operations because of the unions' differences with Laburnum." 194 Va. 872, 880–881, 882, 883, 884–885, 75 S. E. 2d 694, 700–701, 702, 703.

of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities . . . ." 61 Stat. 140, 29 U. S. C. (1952 ed.) § 157.

Petitioners contend that the Act of 1947 has occupied the labor relations field so completely that no regulatory agency other than the National Labor Relations Board and no court may assert jurisdiction over unfair labor practices as defined by it, unless expressly authorized by Congress to do so. They claim that state courts accordingly are excluded not only from enjoining future unfair labor practices and thus colliding with the Board, as occurred in *Garner* v. *Teamsters Union,* 346 U. S. 485, but that state courts are excluded also from entertaining common-law tort actions for the recovery of damages caused by such conduct. The latter exclusion is the issue here. In the *Garner* case, Congress had provided a federal administrative remedy, supplemented by judicial procedure for its enforcement, with which the state injunctive procedure conflicted.[5] Here Congress has neither provided nor suggested any substitute for the

---

[5] The cases relied upon to exclude state jurisdiction are those where a conflict with federal control has been made clear.

"[W]hen Congress does exercise its paramount authority, it is obvious that Congress may determine how far its regulation shall go. There is no constitutional rule which compels Congress to occupy the whole field. Congress may circumscribe its regulation and occupy only a limited field. When it does so, state regulation outside that limited field and otherwise admissible is not forbidden or displaced. The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'" *Kelly* v. *Washington,* 302 U. S. 1, 10. See also, *Amalgamated Assn.* v. *Wisconsin Board,* 340 U. S. 383;

traditional state court procedure for collecting damages for injuries caused by tortious conduct. For us to cut off the injured respondent from this right of recovery will deprive it of its property without recourse or compensation. To do so will, in effect, grant petitioners immunity from liability for their tortious conduct. We see no substantial reason for reaching such a result. The contrary view is consistent with the language of the Act and there is positive support for it in our decisions and in the legislative history of the Act.

In the *Garner* case, we said:

> "The national Labor Management Relations Act, as we have before pointed out, leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will the area in which state action is still permissible.

> "This is not an instance of injurious conduct which the National Labor Relations Board is without express power to prevent and which therefore either is 'governable by the State or it is entirely ungoverned.' In such cases we have declined to find an implied exclusion of state powers. *International Union* v. *Wisconsin Board,* 336 U. S. 245, 254. Nor is this a case of mass picketing, threatening of employees, obstructing streets and highways, or picketing homes. We have held that the state still may exercise 'its historic powers over such traditionally local matters as public safety and order and the use of streets and highways.' *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740, 749." 346 U. S., at 488.

---

*United Automobile Workers* v. *O'Brien,* 339 U. S. 454; *Plankinton Packing Co.* v. *Wisconsin Board,* 338 U. S. 953; *La Crosse Telephone Corp.* v. *Wisconsin Board,* 336 U. S. 18; *Bethlehem Steel Co.* v. *New York Board,* 330 U. S. 767; *Hill* v. *Florida,* 325 U. S. 538.

To the extent that Congress prescribed preventive procedure against unfair labor practices, that case recognized that the Act excluded conflicting state procedure to the same end. To the extent, however, that Congress has not prescribed procedure for dealing with the consequences of tortious conduct already committed, there is no ground for concluding that existing criminal penalties or liabilities for tortious conduct have been eliminated. The care we took in the *Garner* case to demonstrate the existing conflict between state and federal administrative remedies in that case was, itself, a recognition that if no conflict had existed, the state procedure would have survived. The primarily private nature of claims for damages under state law also distinguishes them in a measure from the public nature of the regulation of future labor relations under federal law.

The Labor Management Relations Act sets up no general compensatory procedure except in such minor supplementary ways as the reinstatement of wrongfully discharged employees with back pay. 61 Stat. 147, 29 U. S. C. (1952 ed.) § 160 (c). See also, *Labor Board* v. *Electrical Workers,* 346 U. S. 464.

One instance in which the Act prescribes judicial procedure for the recovery of damages caused by unfair labor practices is that with reference to the jurisdiction of federal and other courts to adjudicate claims for damages resulting from secondary boycotts. In that instance the Act expressly authorizes a recovery of damages in any Federal District Court and "in any other court having jurisdiction of the parties." [6] By this provision, the Act assures uniformity, otherwise lacking, in rights of

---

[6] "SEC. 303. . . .

"(b) Whoever shall be injured in his business or property by reason or [of] any violation of subsection (a) [boycotts and other unlawful combinations] may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof

recovery in the state courts and grants jurisdiction to the federal courts without respect to the amount in controversy. To recover damages under that section is consistent with the existence of jurisdiction in state courts to enforce criminal penalties and common-law liabilities generally. On the other hand, it is not consistent to say that Congress, in that section, authorizes court action for the recovery of damages caused by tortious conduct related to secondary boycotts and yet, without express mention of it, Congress abolishes all common-law rights to recover damages caused more directly and flagrantly through such conduct as is before us.

Considerable legislative history supports this interpretation. Under the National Labor Relations Act, 1935,[7] there were no prohibitions of unfair labor practices on the part of labor organizations. Yet there is no doubt that if agents of such organizations at that time had damaged property through their tortious conduct, the persons responsible would have been liable to a tort action in state courts for the damage done. See *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740.

The 1947 Act has increased, rather than decreased, the legal responsibilities of labor organizations. Certainly that Act did not expressly relieve labor organizations from liability for unlawful conduct. It sought primarily to empower a federal regulatory body, through administrative procedure, to forestall unfair labor practices by anyone in circumstances affecting interstate commerce. The fact that it prescribed new preventive procedure against unfair labor practices on the part of labor organizations was an additional recognition of congressional

without respect to the amount in controversy, or in any other court having jurisdicion of the parties, and shall recover the damages by him sustained and the cost of the suit." 61 Stat. 158, 159, 29 U. S. C. (1952 ed.) § 187 (b).

[7] 49 Stat. 449 *et seq.,* 29 U. S. C. (1946 ed.) § 151 *et seq.*

disapproval of such practices. Such an express recognition is consistent with an increased insistence upon the liability of such organizations for tortious conduct and inconsistent with their immunization from liability for damages caused by their tortious practices.[8]

The language declaring the congressional policy against such practices is phrased in terms of their prevention:

"SEC. 10. (a) The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: . . . ." 61 Stat. 146, 29 U. S. C. (1952 ed.) § 160 (a).[9]

Section 10 (c) directs the Board to issue a cease-and-desist order after an appropriate finding of fact. There is no declaration that this procedure is to be exclusive.

---

[8] ". . . While the Federal Board is empowered to forbid a strike, when and because its purpose is one that the Federal Act made illegal, it has been given no power to forbid one because its method is illegal—even if the illegality were to consist of actual or threatened violence to persons or destruction of property. Policing of such conduct is left wholly to the states. In this case there was also evidence of considerable injury to property and intimidation of other employees by threats and no one questions the State's power to police coercion by those methods." *International Union* v. *Wisconsin Board,* 336 U. S. 245, 253. See also, pp. 255–258 distinguishing the conduct there complained of from that protected by § 7 of the Labor Management Relations Act.

[9] ". . . By retaining the language which provides the Board's powers under section 10 shall not be affected by other means of adjustment, the conference agreement makes clear that, when two remedies exist, one before the Board and one before the courts, the remedy before the Board shall be in addition to, and not in lieu of, other remedies." Conference Report on H. R. 3020, H. R. Rep. No. 510, 80th Cong., 1st Sess. 52.

The history of the enactment of § 8 (b)(1)(A) lends further support to this interpretation. Senate Report No. 105, 80th Cong., 1st Sess. 50, as to S. 1126, said in part:

> "Since this bill establishes the principle of unfair labor practices on the part of unions, we can see no reason whatever why they should not be subject to the same rules as the employers. The committee heard many instances of union coercion of employees such as that brought about by threats of reprisal against employees and their families in the course of organizing campaigns; also direct interference by mass picketing and other violence. *Some of these acts are illegal under State law, but we see no reason why they should not also constitute unfair labor practices to be investigated by the National Labor Relations Board, and at least deprive the violators of any protection furnished by the Wagner Act.*" (Emphasis added.)

Senator Taft, one of the sponsors of the bill, added later:

> "*But suppose there is duplication in extreme cases; suppose there is a threat of violence constituting violation of the law of the State.* Why should it not be an unfair labor practice? It is on the part of the employer. If an employer proceeds to use violence, as employers once did, if they use the kind of goon-squad tactics labor unions are permitted to use— and they once did—if they threaten men with physical violence if they join a union, they are subject to State law, and they are also subject to be proceeded against for violating the National Labor Relations Act. *There is no reason in the world why*

*there should not be two remedies for an act of that kind.*" (Emphasis added.)   93 Cong. Rec. 4024.[10]

If Virginia is denied jurisdiction in this case, it will mean that where the federal preventive administrative procedures are impotent or inadequate, the offenders, by coercion of the type found here, may destroy property without liability for the damage done. If petitioners were unorganized private persons, conducting themselves as petitioners did here, Virginia would have had undoubted jurisdiction of this action against them. The fact that petitioners are labor organizations, with no contractual relationship with respondent or its employees, provides no reasonable basis for a different conclusion.[11]

The jurisdiction of the Supreme Court of Appeals of Virginia is, therefore, sustained and its judgment

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

If this labor organizer had committed murder on the picket line, he would, of course, be subject to prosecution

---

[10] Similarly, H. R. Rep. No. 245, 80th Cong., 1st Sess. 8, said:

"EQUAL RESPONSIBILITY BEFORE THE LAW

"When employers violate rights that the Labor Act gives to employees or to unions, the Board can issue orders against them. *When employers violate rights of employees or of unions under other laws, they must answer in court for what they do.* Under the bill, when unions and their members violate rights given to employers and to employees, the new Board can issue orders protecting the employers and the employees." (Emphasis added.)

[11] See generally, Note, Labor Law—Federal and State Jurisdiction—Common Law Remedies, 27 N. Y. U. L. Rev. 468; Cox and Seidman, Federalism and Labor Relations, 64 Harv. L. Rev. 211, 236.

by Virginia. For the federal Act in no way deals with such conduct and there may be doubt if constitutionally it could do so, at least in such a way as to supersede local law.

The present case is different. The labor organizer's conduct that has led to this judgment for damages is conduct with which the federal Act specifically deals. On the facts found by the state court, the labor organizer and the union have committed an unfair labor practice under § 8 (b)(1)(A), by using threats and the force of a picket line to make employees join a union, contrary to their desires. A state court or a state labor board could not enjoin that conduct, as *Garner* v. *Teamsters Union,* 346 U. S. 485, teaches. And I think like reasons preclude a State from applying other sanctions to it.

This conduct is the stuff out of which labor-management strife has been made, ever since trade unionism began its growth. For years the law of the jungle applied, victory going to the strongest. The emergence of more civilized methods of settling these disputes is familiar history. At first, the law was mostly on the side of management. The courts, as well as the legislatures, shaped the rules against the interests of labor. Gradually the human rights in industry were recognized until they finally received more generous recognition under the Wagner Act.

That Act subjected these industrial disputes to settlement and adjudication in administrative proceedings. For example, the administrative agency was granted power to forbid employers from interfering with trade-union activities. May a union not only institute proceedings before the National Labor Relations Board but sue the employer as well? Or may it have a choice of remedies? I would think not. But if the union may not sue the employer for the tortious conduct, why may the employer sue the union?

I think that for each wrong which the federal Act recognizes the parties have only the remedy supplied by that Act—and for a simple reason. The federal Act was designed to decide labor-management controversies, to bring them to a peaceful, orderly settlement, to put the parties on the basis of equality which the rules designed by Congress envisaged.* If the parties not only have the remedy Congress provided but the right to sue for damages as well, the controversy is not settled by what the federal agency does. It drags on and on in the courts, keeping old wounds open, and robbing the administrative remedy of the healing effects it was intended to have.

---

*Section 1(b) of the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U. S. C. § 141 (b), provides that:

"It is the purpose and policy of this Act, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce."