DALLAS GENERAL DRIVERS, WARE-
HOUSEMEN & HELPERS et al.,
Appellants,

v.

WAMIX, INC., OF DALLAS, Texas,
Appellee.

No. 3270.

Court of Civil Appeals of Texas.

Waco.

June 29, 1955.

Rehearing Denied Sept. 15, 1955.

Mullinax & Wells, Houston Clinton, Jr., Dallas, for appellant.

Rawlings, Sayers, Scurlock & Eidson, Joseph A. Jenkins, Fort Worth, for appellee.

TIREY, Justice.

This is an appeal from an order granting temporary injunction in a labor rela-tions dispute. The court filed findings of fact and conclusions of law. We quote the pertinent parts:

"(1) Wamix, Inc. brought this suit against defendants, jointly and sever-ally, for damages which it had al-ready suffered in the sum of $18,000.00 and alleged that said loss and damage was continuing in its nature and would result if continued in loss and damage in excess of $500,000.00. Upon the filing of said suit, it sought a tem-porary restraining order for immedi-ate relief and for the granting of a temporary injunction upon hearing to preserve the status quo of the parties and subject matter until said princi-pal cause of action could be heard upon the merits, and to prevent colla-teral and consequential damages not compensable at law and irretrievable pecuniary loss. In this connection, the Court finds from the undisputed evi-dence that plaintiff has suffered and experienced a loss in excess of $16,-000.00 as of the date of the trial, and that except for the Court's injunctive and ancillary relief the acts and con-duct of defendants as complained of would have continued and that plain-tiff's loss and damage would have con-tinued in the probable and approximate sum of $100,000.00 or more.

"(2) Wamix, Inc. is a corporation authorized to do business under the laws of the State of Texas and is domiciled in the City of Dallas, Dal-las County, Texas, where it is engaged in the manufacture, sale and distribu-tion of Red-D-Mix concrete almost exclusively within Dallas County, Tex-as, with occasional deliveries to adja-cent counties, but never beyond the confines of the State of Texas. It maintains its principal plant, office, and place of business at 2221 Irving Boule-vard, Dallas, Texas, and, in addition thereto operates three plants located at 4400 Warcola Street, Hunter-Ferrel Road, and International Road on the outskirts of Garland, all within the confines of Dallas County, Texas.

"The constituent parts making up the concrete sold by Wamix and used in the manufacture thereof, including sand, gravel, crushed limestone, cement, etc. originate within the State of Texas, mostly within the Dallas-Fort Worth area. None of the materials or any constituent parts thereof come from without the State of Texas. The concrete sold by Wamix, Inc. is used to build permanent edifices and other permanent structures, all of which are attached to Texas real estate and become part of such real estate. The size, bulk, unwieldiness, and the fact that it becomes part of the real estate when utilized effectively prevents such concrete from ever moving in the stream of interstate commerce. Consequently, none of the concrete sold by Wamix, Inc. moves in the stream of interstate commerce or becomes constituent part of any other article which moves in said stream of commerce. Concrete sold by Wamix, Inc. is a perishable produce and must be utilized within approximately one hour after it arrives at the job site or it will be totally destroyed and become valueless. All concrete sold by Wamix, Inc. becomes part of permanent structures within the confines of Dallas County and immediately adjacent Texas counties. During the fiscal year ending August 31, 1954, Wamix, Inc. sold concrete from its four plants of a monetary value of approximately $2,000,-000.00. The only service performed by Wamix, Inc. for the fiscal year ending August 31, 1954 was mixmobile hoisting. For such service, Wamix, received approximately $2,000.00.

"Plaintiff's four manufacturing plants, trucks and motor vehicles, office furniture and fixtures, stock on hand and equipment necessary to its operations have an approximate value of $500,000.00. Plaintiff employs 29 to 31 truck drivers to drive its trucks and deliver its products. In addition thereto, plaintiff employs approximately 35 other employees, but those employees are not here involved.

"(3) Each of said union defendants is a labor organization doing business in Texas with its domicile and principal place of business and offices in Dallas County, Texas. The respective individuals and officers of Local 745, as named in the original petition, each reside in Dallas County, Texas.

"(4) At all of the times material hereto, plaintiff had orders from and contracts with local general contractors who are engaged within the City and County of Dallas in building and erecting permanent structures, among those being the Inge-Hayman Construction Company, Mobley-Speed Cement Contractors, the O'Rourke Construction Company, and J. W. Bateson & Company, Inc. The general contractors purchased and contracted to purchase from plaintiff concrete in motor vehicles to the job site or places where the general contractors were using said concrete in the fulfillment of a contract in respect to the erection of the buildings and structures. Such concrete was an indispensable and necessary ingredient and factor for the purpose of completing and erecting said buildings. All of the trucks and motor vehicles used in transporting and delivering said concrete to the job site were under the exclusive control and possession of plaintiff under a valid lease arrangement with the owners of said trucks.

"(5) In the year 1951, certain proceedings were instigated by Local 745 before the 16th Regional Director of the National Labor Relations Board involving a controversy between said employees and Wamix, Inc. These proceedings and the final order of the Court of Appeals for the 5th Circuit at New Orleans disposing of same are identified in this record as Exhibits Nos. ——, ——, and ——. That Court's order which was a determination of

the litigation found that a labor dispute then existed under the facts in the record and that the same should and could be removed and discharged by affirmative action on the part of Wamix, Inc. by complying with the order of the Board as approved by the Court. From the evidence in this record, the Court finds that Wamix, Inc. in good faith fully complied with all the mandates of said Court and that such compliance was completed prior to September 30, 1954, so that on September 30, 1954, no labor dispute existed between plaintiff and defendants.

"(6) There was no labor dispute between any of the general contractors and their respective employees at any time material to this case. It was so stipulated by the respective parties hereto.

"(7) Under the rules and regulations of the National Labor Relations Board diminishing, defining and setting forth certain standards for the exercise of its jurisdiction prior to August 1, 1954, which is reflected by Exhibits introduced by defendants herein, and by certain correspondence by the plaintiff's attorney and Edwin A. Elliott, Regional Director of the National Labor Relations Board, introduced as Exhibits in this record, it appears that the business of plaintiff does not have such a close, intimate or substantial relation to interstate commerce as would justify the Board in asserting jurisdiction over plaintiff's operations. It affirmatively appears therefrom that the Board, in fact, declined jurisdiction under its jurisdictional tests.

"(8) About August 27, 1954, a series of bargaining negotiations in respect to wages, hours, working conditions, and other conditions were mutually begun between Local 745 and the authorized officers of plaintiff. The plaintiff submitted five complete written contracts in respect to such matters to the Local which it was willing to sign. The union submitted counter proposals which were largely embodied in three written contracts which it was willing to execute, and good faith bargaining between the parties continued until the 23rd day of September, 1954, at which time the president of Local 745 was brought into the negotiations for the first time and after a discussion of approximately forty-five minutes, upon the suggestion of the president of Local 745, the other negotiators, the business agent and attorney for the Local refused to bargain further and walked out of the meeting. Plaintiff never at any time refused to bargain with said defendants in good faith. On the 15th day of September, 1954, the officers of Local 745 called a meeting of all of the 31 employees of plaintiff to be held at the Labor Temple for the purpose of taking a strike vote. Only 11 of the 31 employees attended and 10 voted for strike and 1 against the strike.

"(9) Sometime after May 20, 1954, and after the order of the 5th Circuit Court at New Orleans, C. M. Roseborough, as business representative of Local 745, with the aid and under the direction of other officials of said Local, commenced a new organizational campaign among the truck driver employees of plaintiff, seeking authorizations from said employees empowering Local 745 to represent them as their exclusive bargaining agent in respect to wages, hours, etc. Most of said employees refused to join the Local or authorize it to represent them. It is indeed doubtful from the record that said Local had obtained authorizations from a majority of the bona fide employees involved during the time the union was representing to the plaintiff that it did represent a majority and was demanding recognition on such basis. The effect of Roseborough's testimony is that he did not know whether he had a majority signed up or not since he did not know the number of employees in the unit in-

volved during such organizational campaign nor at the time of the trial. There was also some question as to whether or not two of the employees signing authorization cards were employees of the plaintiff at the time or were within the proper unit.

"(10) Immediately prior to September 30, 1954, two meetings were held at the instigation of the defendants, particularly the officials of Local 745, one at the Travis Hotel in Dallas, Texas, at which time the business agent advised the employees in attendance of the progress being made and the happenings occurring at the various meetings between the union and the company concerning the new contract and particularly were the employees advised that the company claimed it could not pay an increase in wages because of its financial condition. The second meeting was held at the Labor Temple to which all of plaintiff's truck driver employees were invited and only 11 attended. The purpose of this meeting was to determine upon a vote of the employees involved whether or not a strike should be called and a picket line established. Approximately 18 of the current employees did not attend said union meeting, but of these present 10 voted to strike and 1 voted no strike. Thereupon, said defendants agreed by and between themselves, each with the other, though constituting a minority of said employees, that plans would be formulated and means adopted to force and compel plaintiff to sign and execute a contract as proposed by said union, and said defendants did in pursuance thereof unlawfully conspire and agree to establish a picket line around the various premises of plaintiff and a secondary picket line at, upon and near the premises of the customers of plaintiff where said concrete was contractually to be delivered by plaintiff in its trucks driven by its truck drivers, and to otherwise prevent plaintiff from carrying on its lawful busi-

ness and to prevent the majority of the employees of plaintiff who had refused to strike or to cease work and who desired to continue to work from so doing. The primary picket line was established September 30, 1954, by defendants which included some 13 of the employees of plaintiff. Immediately thereafter, 3 of said striking employees returned and requested to be reinstated as employees, which the plaintiff did. Ten of said employees remained on strike and maintained the primary picket line under the direction of the officials of said Local 745. Thereupon, plaintiff employed 10 new employees on a permanent basis to replace those who had voluntarily gone out on said strike. The then employees of plaintiff, consisting of approximately 29, continued to deliver plaintiff's concrete to its customers in a normal manner.

"(11) Thereupon, defendants met with their attorneys and agreed that since the primary picket line was ineffective to accomplish their object that it was necessary to have new banners printed to be carried and exhibited by the defendants at the job sites at the places and during the time plaintiff's employees and trucks were delivering and selling its concrete, thereby renewing its previous conspiracy and agreements and further agreeing and conspiring to establish roving and ambulatory pickets and to carry on secondary picketing at the job sites of plaintiff's customers in the City of Dallas for the purpose of:

"(a) Having plaintiff's customers and the public generally to believe that the plaintiff was employing strike breakers; that the company's regular drivers were out on strike.

"(b) Compelling said customers to cease doing business with plaintiff and to breach the written contract of purchase with it.

"(c) To prevent the employees of plaintiff who desired to continue work

from doing and performing work for it.

"(d) To compel said 29 employees who desired to remain at work to become members of said Local 745 or to authorize said Local to bargain for them.

"(e) To compel the plaintiff to acknowledge said Local as the bargaining agent of its employees who had not authorized said Local as such.

"(f) To compel the plaintiff to sign a contract increasing wages beyond what the company was financially able or willing to pay.

"(12) On or about the 6th day of October, 1954, said defendants, in agreement with attorneys, caused picket banners to be prepared containing the words and figures as follows: 'These Wamix trucks are being driven by strike breakers. Regular drivers are on strike. We are not picketing any other company. Local 745.' Beginning on October 6, 1954, and continuously until the issuance of this Court's temporary restraining order on October .18, 1954, the defendants Barnett, Cox, Terry, Harrison and others, with the approval and under the direction of the officers and agents of Local 745 would observe the trucks of plaintiff as they were being sent to job sites of customers for delivery of concrete and would follow said trucks to the respective job sites of customers and simultaneously with the arrival of plaintiff's truck at said point, defendants would establish a picket line thereat, exhibiting the banners with the words and figures described hereinabove to the employees of the contractors on said job site, with the result that the employees of the contractors at said job site would cease work and refuse to work and pour cement or continue the construction of said permanent buildings as long as said picket line was at the job site. As a result, plaintiff's concrete in the respective trucks was totally lost and destroyed and the general contractors, customers of plaintiff, by reason thereof refused to do business with plaintiff or to further purchase its commodity.

"(13) The employees of said contractors at said job sites were members of some craft or union affiliated with the AFL and refused to work behind said picket line. The defendants in displaying said picket banners knew that the employees of the contractors on the job sites would not perform any service or in any manner handle said concrete during the time said picket line was being evidenced thereat.

"(14) On October 6, 1954 Eugene Pannell, one of the truck drivers who originally went out on strike on September 30 but who had immediately voluntarily returned and been reinstated as an employee of plaintiff, was followed by the defendants Cox and Overton while driving plaintiff's truck loaded with concrete to be delivered to Kroehler Manufacturing Company at the job site in Dallas. Immediately upon arriving at the job site, Cox and Overton began carrying the picket sign back and forth in front of the entrance and gate of said job site with the inscription thereon plainly visible, and thereupon Watkins, who was a union man affiliated with AFL and was the job foreman at the job site, refused to permit Pannell, the driver, to deliver said concrete. The driver was compelled to take his truck and load away from the premises, and as he was leaving the job site, defendant Cox said to Pannell, 'We got her tied up, haven't we, you damned scab.'

"(15) On the morning of October 7 or 8, 1954, a quantity of roofing nails about 1½ inches long had been thrown in the path of the trucks coming in and out of the premises of plaintiff at 2221 Irving Boulevard. Prior to that time no such nails had been ob-

served in said driveway. There was no direct proof as to who had placed these nails in said driveway, but the Court finds that they were obviously maliciously placed therein by someone seeking to do property damage to plaintiff.

"(16) The Wamix trucks being followed and picketed by defendants were not being driven by strike breakers nor were any of the 29 or 30 drivers then employed by plaintiff on strike. All of the jobs of the ten were permanent employees to the extent above mentioned. The banners were false and untrue.

"(17) The appearance of the defendants carrying and exhibiting said picket banners and the inscription thereon at the various job sites during said times resulted in a stoppage of work on the part of the job site employees and prevented the respective contractors from continuing to do business with plaintiff.

"(18) The purpose, intent, and effect of such secondary picketing which resulted in a stoppage of work by the job site employees made it impossible for plaintiff to continue to do business with his construction customers. The business relations between plaintiff and said construction customers prior to said secondary picketing had been friendly and profitable.

"(19) The Court is further of the opinion and concludes:

"(a) In the light of the rules and regulations recently promulgated by the National Labor Relations Board defining and setting forth certain standards for the exercise of its jurisdiction, and the refusal of the Board to take jurisdiction thereof as is evidenced by the exhibits in this record, it appears that the business of plaintiff does not have such a close, intimate or substantial relation to interstate commerce as would justify the Board in asserting jurisdiction over plaintiff's operations, and it affirmatively appears that the Board would and did refuse to exercise its powers in regard to the present controversy if its jurisdiction were invoked. Also, the plaintiff's suit is primarily for damages and the injunction is sought as ancillary relief to preserve the status quo until the case is finally heard and determined on its merits. The Court is therefore of the opinion that it does have jurisdiction of the cause.

"(b) That the defendants conspired and joined together in an effort to enforce the unlawful objectives found hereinabove which would have compelled plaintiff to acquiesce in the demands of the union, and such recognition would have been a violation of the fundamental rights of such employees to voluntarily and freely work if they desired and to choose a bargaining agent of their free choice. The acts and conduct of defendants in carrying on the secondary picketing and in exhibiting the picket signs with the false and untrue statements thereon was and is in violation of Art. 5154f, Rev.Civ.Stats. of the State of Texas. [Vernon's Ann.Civ.St.].

"(c) The acts and conduct of the defendants Cox and Overton in respect to plaintiff's employee, Pannell, was an attempt to prevent the said Pannell from engaging in his lawful vocation.

"(d) The formation and execution of the conspiracy in the manner and to the extent herein found was in violation of the anti-trust and anti-monopoly laws of the State of Texas in that said conduct constitutes a combination of capital skill and acts of two or more persons to carry out restriction of trade and commerce and the free pursuit of plaintiff's business.

"(e) The plaintiff will suffer irreparable damage if the unlawful conduct of the defendants is not enjoined. The status quo which existed prior to the establishment and main-

tenance of the secondary picketing on October 6, 1954, should be restored and continued until this case can be heard on its merits.

"It is therefore ordered that a temporary injunction be issued to continue in force and effect until this case is finally disposed of on its merits, enjoining and restraining the union and the other named defendants, their agents, servants and employees, and all those acting in concert with them:

"(1) From picketing plaintiff's concrete hauler and mixer trucks at, on or near, in or about the premises where Inge-Hayman Construction Company, Mobley-Speed Cement Contractors, The O'Rourke Construction Company, J. W. Bateson & Company, Inc., Inwood Construction Company are engaged in constructing buildings or performing other services and using or desiring to use the concrete sold and delivered by plaintiff and from picketing on, near, in or about the premises where any other persons, firms, or corporations are engaged in constructing buildings or other work and are purchasing or desirous of purchasing plaintiff's concrete, and from establishing and maintaining ambulatory and roving pickets to follow or accompany any of plaintiff's concrete hauler-mixer trucks while operating in the usual course of business in the delivery of Red-D-Mix concrete to any job site. The defendants are not enjoined hereby from carrying on and maintaining their primary picket line at and near the principal places of business of plaintiff.

"(2) From publishing orally or in writing or displaying any statement to the effect or implying that Wamix trucks are being driven by strike breakers or that all of the regular drivers are on strike or to use any banner having such language or implication thereon in any strike at any place.

"(3) From the use of insulting, threatening and indecent language towards any of plaintiff's employees who desire to work for plaintiff for the purpose of interfering with, hindering and intimidating said employees while at or near the plaintiff's place of business or while driving or operating the motor vehicles of plaintiff in the execution of their duties as such employees.

"It is accordingly ordered that the Clerk of this Court issue a temporary injunction upon plaintiff's executing and filing in behalf of the defendants a bond, with good and sufficient sureties, in the sum of $2000.00, as provided by law."

Applicant complied with the order fixing the bond and defendant seasonably perfected its appeal to the Dallas Court of Civil Appeals and the cause is here on transfer order of our Supreme Court.

Appellants assail the decree entered on eight points. They are substantially: (1) The court erred in retaining jurisdiction of plaintiff's application for temporary restraining order, and subsequently for the temporary injunction because, under the Labor Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq., exclusive jurisdiction to remedy the acts complained of is vested in the National Labor Relations Board; (2) the granting of temporary restraining order was in violation of Rule 680, T.R.C.P.; (3) in refusing to dissolve the temporary restraining order because it was issued contrary to law; (4) because the court made fact findings in the writ of injunction which were without support in the evidence and contrary to the evidence; (5 and 6) the decree deprives the defendants of the exercise of the right of freedom of speech, contrary to the first and fourteenth amendments to the Constitution of the United States and Art. 1, § 8 of the Vernon's Ann.St. Constitution of Texas; (7 and 8) the action of the court in granting temporary restraining order and in refus-

ing to dissolve same and in granting temporary injunction constitute an abuse of discretion because in so doing the trial court permitted gross errors reflecting bias and prejudice against defendants.

Appellee challenges each of the foregoing points.

Appellee's first counter point is:

"The trial court did not err in holding that it had jurisdiction over a suit for damages and the equitable power to grant ancillary injunctive relief to preserve the status quo, despite the fact that a union was one of the parties defendant and its illegal activities were thereby enjoined. The Labor Management Relations Act of 1947 does not give the National Labor Relations Board any jurisdiction or power to hear and determine damage suits. Both the Supreme Court of the United States and the Supreme Court of the State of Texas have so held in recent decisions, which decisions are in point and control the disposition of this case."

We are in accord with this view and think it is determinative of this cause.

This is a suit for damages in the nature of a tort action where the trial court in the exercise of its discretion has granted temporary ancillary relief for the purpose of maintaining the status quo and preventing irreparable injury pending trial on the merits. Plaintiff pleaded that the unlawful acts and conduct of defendants and the damages sustained, which were alleged to be continuing, were the result of an unlawful conspiracy performed and executed by defendants. It tendered evidence to sustain the allegations in its pleadings. The temporary injunction enjoins the Dallas General Drivers, Warehousemen & Helpers, Local Union 745, one of the appellants, from the commission of certain acts that the court finds to be illegal and such temporary writ enjoins other parties therein named. After a careful consideration of the record, it is our view that the case involves only a temporary injunction. Such being our view,

we are concerned here with only three questions: (1) Did the plaintiff's petition state a cause of action for damages over which the trial court had jurisdiction? (2) Is there evidence in the record tending to support such cause of action? (3) Did the trial court conclude that it was necessary to preserve the status quo of the litigants pending trial on the merits? We think that each of the foregoing questions must be answered in the affirmative. Being of this view, we think the appeal here before us is controlled by the decision of our Supreme Court in Texas Foundries, Inc., v. International Moulders & Foundry Workers Union, 151 Tex. 239, 248 S.W.2d 460. The opinion of Chief Justice Hickman in the foregoing cause is clear, comprehensive and is free from all doubt and ambiguity, and it is applicable and controlling here. Going back to the findings of fact made by the trial court, we think the finding designated as Paragraph 1 is sufficient to sustain the court's action in this matter. We have previously quoted it and it would serve no useful purpose to state it again.

We think we should say that among the other findings of the trial court we find: " * * * also the plaintiff's suit is primarily for damages and the injunction is sought as ancillary relief to preserve the status quo until the case is finally heard and determined on the merits. The court is therefore of the opinion that it does have jurisdiction of the cause." We think the evidence tendered is sufficient to support the view of the trial court, and, such being true, it is our view that it had jurisdiction. The Statement of Facts contains more than 600 pages. It is our view that the testimony tendered therein is sufficient to sustain each of the findings made by the trial court. The opinion of our Supreme Court heretofore cited is in accord with its previous holdings in North East Texas Motor Lines v. Dickson, 148 Tex. 35, 219 S.W.2d 795, 11 A.L. R.2d 1065, and is also in accord with the Supreme Court of the United States in International Union U.A.W. A.F. of L. v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651; Giboney v. Empire Storage & Ice Co., 336

U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Garner v. Teamsters Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228; United Construction Workers v. Laburnum Construction Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025. See also Benjamin v. Foidl, 379 Pa. 540, 109 A.2d 300.

In view of what we have said, it is obvious that we are of the view that the trial court did not abuse its discretion in granting the temporary writ of injunction. Such being our view, each of the assignments urged by appellants passes out of this case under the doctrine announced by our Supreme Court in Texas Foundries, Inc., v. International Moulders & Foundry Workers Union, supra. In the event we are mistaken in this view, each is overruled.

Accordingly, the judgment of the trial court is in all things affirmed.