WALDEN, Judge.
These are consolidated appeals in a labor union violence case. It results from disputes concerning jurisdiction over jobs.
Dennis Walton struck Earl Lowell Las-sitter with his fists.[1] Lassitter suffered personal injuries, as a result.
*636 Walton was a member of International Union of Operating Engineers and International Union of Operating Engineers, Local No. 675. Lassitter was not a member of the defendant unions. It was charged that Walton was an agent of his Local and the Local was an agent of the International Union.
Lassitter sued Walton and Walton’s two unions for damages. The jury trial resulted in these judgments against the defendants totaling $1,250,000:

Compensatory Damages

Walton "|
Local No. 675 >- Jointly and severally $ 240,000
International UnionJ

Punitive Damages

Waltón $ 10,000
Local No. 675 300,000
International Union 700,000
All defendants appeal. While the points are several, they group generally as a challenge to liability (except as to Walton) and damages.
We affirm the judgments as to liability —reverse them as to damages — and remand for a new trial as to all defendants upon the issue of damages, compensatory and punitive.
LIABILITY
THE LOCAL UNION:
Lassitter charged the Local with responsibility, 1) directly, claiming the Local ordered the assault, and 2) indirectly, claiming the Local responsible under re-spondeat superior for the acts of Walton. The record contains adequate evidence from which the jury could infer that the union had ordered the assault, such as:
1. The President of the Local wrote down Lassitter’s name upon learning-of Lassitter’s intent to thwart the wishes of the union,
2. Walton admitted beating plaintiff because of an “agreement”[2] that plaintiff would not work on the job site,
3. A union member who witnessed the event was requested by the President of the Local not to testify.
And it is reasonable that the jury would find the union liable under respondeat superior when the following evidence was given that Walton was, indeed, the Local’s steward and thereby its agent:
(l) Walton checked the union membership books of workers on the site, (a steward’s duty),
*637 (2)Walton cleared in men and equipment when a new contractor came on the j ob,
(3) Walton directed a witness to contribute to the Local’s blood bank,
(4) Walton ordered members of another union off equipment claimed by the Local,
(5) There was evidence that Walton had an agreement of some sort that Las-sitter would not work on the job, and prior violent methods of the Local were evidenced in that
(6) A union meeting of stewards had been held in which the “tearing up” of “guys in Hallandale” who were doing “the union’s” work was discussed and weapons distributed.
(7) Two witnesses, each a member of the Local, identified him as a steward, as did a foreman for another contractor on the job, and
(8) A member of the Local testified that when asking for the Union Steward he was directed to Walton.
We are satisfied under authority of Thee v. Manor Pines Convalescent Center, 235 So.2d 64 (4th D.C.A.Fla.1970) that plaintiff made an adequate case to present to the jury because an agency relationship was prima facie established by the proofs. See also Forster v. Red Top Sedan Service, Inc., 257 So.2d 95 (3d D.C.A. Fla.1972); Watkins v. Sims, 81 Fla. 730, 88 So. 764 (Fla.1921). Cf. Reina v. Metropolitan Dade County, 285 So.2d 648 (3rd D.C.A.Fla.1973), where it was determined that the assault was clearly not in the performance of his master’s duties.
Authority to support a finding of vicarious liability for tortious behavior is seen in Wackenhut Corporation v. Greene, 238 So.2d 431 (3rd D.C.A.Fla. 1970); Dye v. Reichard, 183 So.2d 863 (4th D.C.A.Fla. 1966) and Sands v. Ivy Liquors, Inc., 192 So.2d 775 (4th D.C.A.Fla.1966). In Atlantic Coast Line R.R. Co. v. Burquest, 101 So.2d 828 (2d D.C.A.Fla.1958) the court said:
“ ‘ . . . If the employee, being engaged about the business of the employer, adopts methods which he deems necessary, expedient or convenient, and the methods adopted prove hurtful to others, the employer may be held liable. The purpose of the employee’s act, rather than the performance thereof, is said to be the important consideration.
The jury was properly instructed as to liability by the trial court in accordance with Florida Standard Jury Instruction 3.-3(b), and no objection or other request on the issue was made during the charge conference.
The Local argues several minute propositions in its appellate presentation. We deem them, other than as here discussed, to be without merit and without need for opinion exploration. Thus, there is no basis for disturbing the judgment as to the Local’s liability.
THE INTERNATIONAL UNION:
It is accepted that for the International to be liable plaintiff must have proved that the Local Union was International’s agent. There is sufficient evidence for a jury to conclude that the Local ordered, or approved, the assault and that the assault was within the scope of Walton’s duty. See, M R & R Trucking Co. v. Griffin, 198 So.2d 879 (1st D.C.A.Fla.1967). The question remains whether the International is liable for violence initiated by affiliated locals in jurisdictional disputes. The International appellate position is that its constitution "permits Local Unions to conduct their relations with employers, including the right to strike, boycott and take actions incidental thereto . . . . ” It argues, therefore, that there was a complete absence of International’s involvement. The International attempts *638 to analogize the local-international situation with corporate parent-subsidiary liabilities. The comparison is not reasonable as the corporate veil hardly could be said to cloak an international union whose directives and constitution govern a local.
The annotation at 36 A.L.R.3d 405 (1971) states at 411:
“If an international union is joined as a defendant in an action in which the unlawful conduct was allegedly committed by members of a local union, the union’s constitution should be examined to determine the relationship of the organizations to each other.”
Contra to International’s position, the International constitution specifically provides for its complete domination over the Local. The International president may suspend or remove Local officers, and suspend or revoke Local charters. The constitution provides the International with power to prohibit Locals from taking any action with an employer unless authorized by the International.[3] In addition, the Local is referred to in the constitution as a “subordinate sub-division” of the International. In International Brotherhood of Teamsters v. United States, 275 F.2d 610 (4th Cir. 1960) the court found that provisions similar to these evidenced such control “as to warrant the conclusion that the local . . . [was] ... a component of the International.”
The case of United Brotherhood of Carpenters and Joiners v. Humphreys, 203 Va. 781, 127 S.E.2d 98 (1962), cert., den. 371 U.S. 954, 83 S.Ct. ' 509, 9 L.Ed.2d 501 (1963), held on similar facts that all defendants (including the International) were liable. The Virginia case of United Brotherhood referred to an earlier decision by that court which was affirmed by the U. S. Supreme Court; the United Brotherhood court interpreted their decision in United Const. Workers v. Laburnum Const. Corp., 194 Va. 872, 75 S.E.2d 694 (1953), aff’d 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954), to say,
“[T]hat the very nature of the organization of the International Union was sufficient to show that the district organization was an arm of the international, and an agency relationship existed between the two bodies.” 127 S.E.2d at 102.
This United Construction case post-dates the case of United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922), upon which International relies. Further, the Coronado case may be distinguished because it is the evidence of agency upon which the jury may rely, and in Coronado evidence of such agency was found lacking. The union constitutional provisions mentioned above, when examined, can provide the evidence from which a jury might properly infer an agency relationship. An agent of the International regularly reported on jurisdictional disputes and Local activities. It is evident from the Virginia case of United Const. Workers, that upon evidence of pervasive constitutional control the International union may have an agency relationship with the Local, and that this jury was justified in finding that relationship. We believe that this discussion covers the central appellate assertion as to its liability.
We go now to the second major phase of this appeal, damages.
*639 DAMAGES
Were the damage awards excessive? We are obliged under the facts of this case and upon our consideration of the advice of counsel to answer in the affirmative. It is our firm judgment that the awards singly and in combination are so manifestly excessive as to shock our judicial conscience. Under the circumstances the verdicts could only be indicative of the improper influences of passion and prejudice working on the jury. These influences probably emanated from usual well known union partisanships, excited by injuries to an innocent victim, coupled with the publicity [4] and heated climate [5] under which the case was tried. See Generally 9A Fla. Jur. Damages §§ 98 and 99 (1972).
While not controlling, it is of interest in the consideration of the correctness of the damage awards to note and compare the values which Lassitter’s own counsel assigned to the case in closing argument with the amount of the awards:

Compensatory Damages:

Lassitter's counsel argued and urged: $ 40,700 Jury awarded: $240,000

Punitive Damages:

With reference to International :

Lassitter's counsel argued: $300,000 Jury awarded: $700,000

With reference to the Local:

Lassitter's counsel argued: $100,000 Jury awarded: $300,000

With reference to Walton:

Lassitter's counsel did not argue an amount as to Walton. Jury awarded: $ 10,000
Lassitter’s counsel very thoroughly and extensively, as concerns the claim for compensatory damages, itemized all of the allowable categories of damages, and coupled it to the usual per diem argument to project the total sum which he deemed warranted and expedient to mention to the jury. However, as reflected above, the jury award of compensatory damages was more than five times larger than counsel’s estimate. And as shown in the record, more than eighty-eight times larger than Lassitter’s claimed special damages. With reference to punitive damages this matter was thoroughly urged to the jury one way and the other with the above reflected results. The award against the Local was three times that suggested and the award against International was more than twice the amount urged.
As we say again, we do not think counsel’s argument is controlling and neither do we suggest that a jury may never return a larger sum. However we do think that the gross disparity here displayed in each category can mean only that the jury operated on the basis of passion and prejudice or other improper influence quite apart from the proper adjudication of damages based upon the facts and law as was instructed to them by the trial court.
Because of the fine and long standing reputation and expertise of Lassitter’s counsel, confirmed by review of the record here, we can in nowise attribute the chasm existing between the argument figures and the verdicts to any undue timidity or professional misstep in the presentation of Lassitter’s case.
COMPENSATORY DAMAGES
The injuries:
Lassitter suffered temporary injuries consisting of a 'severe hematoma, swollen eye, sprained jaw and neck, assorted cuts, and bruises about the head and elbow. His permanent injury was a partial loss of hearing in one ear, which is fully correcta *640 ble with the use of a hearing aid for the twenty-eight years of his life expectancy, and a small scar over one eye. Lassitter lost no time from work and hence had no loss of wages and neither was his earning capacity impaired in any manner. His past and future medical expenses, according to his own witnesses, totaled $2,700.
'Reflective of the situation is that, following the assault, plaintiff reported to the emergency room of a nearby hospital where he was cleaned up and bandaged. Immediately after his treatment he returned to his place of employment and went to work. Two days thereafter he re-reported to the hospital to have his bandages replaced. He then reported to Dr. Burgess with complaints of a neck sprain as a consequence of which he received some physical therapy treatments. A Dr. Dasher did thereafter determine the partial loss of hearing and recommended the use of a hearing aid. Without in anywise minimizing or denigrating Lassitter’s claim and his injuries, it is manifest to us that the award of $240,000 is far in legal excess of fair and just compensation which is the polestar of compensatory damages. We can find no way, however we view the evidence, to justify a sum in the area of $240,000. Loftin v. Wilson, 67 So.2d 185 (Fla.1953).
Thus, we hold that the compensatory damage award against these defendants is without legal or factual support and same must be reversed for a new trial.
PUNITIVE DAMAGES
As a preliminary, it is our view that under the circumstances and facts of this case the trial court was warranted in instructing the jury on the question of punitive damages and indeed there was a proper basis for a verdict as to them. This is simply true because of the unprovoked assault and battery upon Lassitter and we make no- further particular comment about this.
Our concern is with the amount of such damages awarded, that is to say, were the amounts of the verdicts supported and legally permissible ? We think not.
We have been unable to determine any basis or hard and fast rule or formula in Florida as to the appellate approach to the proposition of excessive punitive damages. And we can only suppose that, depending upon the case and perhaps as a subjective standard, there must be some bridle, some yoke, some outer limit which can be determined at the appellate level.’ This is true even though full allegiance must be given to the function and nature of the task of the jury as enunciated in Richards Co. v. Harrison, 262 So.2d 258 (1st D.C.A.Fla.1972); Threets v. Hardison, 255 So.2d 267 (Fla.1971) and Ward v. Orange Memorial Hospital, 193 So.2d 492 (4th D.C.A.Fla.1966). See also 9A Fla. Jur. Damages §§ 100 and 102.
First, it is our understanding that there should be some reasonable, albeit imprecise, relationship between punitive and compensatory damages. Air Line Employees Ass’n Int. v. Turner, 291 So.2d 670 (3d D.C.A.Fla.1974); Crowell-Collier Pub. Co. v. Caldwell, 170 F.2d 941 (5th Cir. 1948); Hutchinson v. Lott, 110 So.2d 442 (1st D.C.A.Fla.1959). With this background we opine that there is an impermissible and gross imbalance here between the actual damages suffered and the punitive damages awarded.
Secondly, it is a basic tenet that the office of exemplary damages is to punish the defendants and serve as a deterrent to them and others. They stem from acts committed with malice, willfulness and reckless indifference. See 9A Fla.Jur. Damages § 136 (1972); Levine v. Knowles, 197 So.2d 329 (3d D.C.A.Fla.1967). The punitive damages, therefore, should hurt, but they may not bankrupt. Joab, Inc. v. Thrall, 245 So.2d 291 (3d D. C.A.Fla.1971). Thus, for a jury to dis *641 cern whether a defendant would be capable or incapable of paying a punitive award, or the desired degree of punishment or deterrence, it is necessary for there to be a relationship between these goals and the financial worth of a defendant. Richards Co. v. Harrison, 262 So.2d 258 (1st D.C.A. Fla.1972); Hutchinson v. Lott, 110 So.2d 442 (1st D.C.A.Fla.1959). In Hutchinson, supra, for example, the court found it necessary to take judicial notice of the salary of a policeman in order to determine the propriety of a punitive award. In Richards, supra, the court, at page 263, of 262 So.2d, held:
“In determining the amount of punitive or exemplary damages, the pecuniary circumstances of defendant must be considered since an amount that would be pecuniary punishment to a man of small means would not necessarily serve as punishment to one of large means.”
Thus, taking into account all considerations, the pecuniary worth of a defendant charged with possible punitive damages must be adduced as evidence before the jury. See Brock v. Maine, 293 So.2d 375 (4th D.C.A.Fla.1974); Joab, Inc. v. Thrall, supra; Jacksonville Frosted Foods, Inc. v. Haigler, 224 So.2d 437 (1st D.C.A.Fla.1969).
Was this done here? The evidence given of defendants’ finances was as follows:
International Income of $600,000 per month from dues.
Local Income of $250,000 per year from dues.
Walton None.
There was no evidence of liabilities, expenses or net worth. There was simply no basis therefore for the jury to perform its duty and make an informed decision as to whether the awards were too much, too little, or just right in line with Florida Standard Jury Instruction No. 6.12.[6] For-asmuch as we or the jury could know the awards may have served to utterly bankrupt the defendants; on the other hand, they may have been, in balance, of such insignificance as to serve no punitive or exemplary purpose.
And now to put things together, we reiterate that it is necessary in support of the verdict awarding punitive damages for there to be adequate proofs of the defendants’ net worth. We further reiterate that the proofs in this regard are altogether insufficient here.
We now come to the next step in our analysis. It is our view and specific holding that the burden of proving the net worth of the defendant in such cases is on the plaintiff who has plead the claim. While we have found no particular case so holding, we believe that this proposition is in general accord with the basic jurisprudence of this state. With the liberal and easy discovery procedures found in the Florida Rules of Civil Procedure [7] it would be a matter of small moment to cause the defendant to produce a current profit and loss statement and balance sheet or to call its treasurer or other competent person to testify as an adverse witness about such matters, so as to at least establish prima facie the defendants’ net worth. It is our view that since the plaintiff has made the claim it is incumbent upon him to produce the proof supporting same, both for jury assessment and for later appellate review.
Having considered all of the circumstances and the intendment and theory of *642 damages, it is our conclusion that the justice of this cause requires a reversal and a new trial on the issues of damages only. Reversed and remanded for proceedings consistent herewith.
Reversed and remanded.
OWEN, C. J., and DOWNEY, J„ concur.

. The events supported by the record as presented by Lassitter are as follows:
“On the morning of April 8, 1970, EARL LASSITTER’S pile-driving crew for Industrial moved onto the construction site of Plaza South to commence a pile-driving sub-contract. Defendant WALTON was waiting for them.
“Although he had never met the plaintiff at all before that date, nor had any dealings with him, WALTON approached LASSITTER and *636 ordered him off the job. Telling plaintiff, ‘We don’t want any trouble,’ WALTON called him a ‘son-of-a-bitch’, and told him to get off and keep off or he would ‘beat his ass.’
“LASSITTER later left the job site and did not see WALTON until April 10, two days following. On the morning of the 10th, before LASSITTER’S arrival, WALTON was present at the site looking for him, and threatening that he better not come on the job.
“Later in the morning, plaintiff arrived at the site to oversee his crew’s activities. WALTON was not at the scene when he arrived. At approximately 11:00 a. m. WALTON emerged from his car parked across the street from where Industrial’s men were working.
■ “Pulling on a pair of tight leather gloves as he approached, WALTON came straight up to the plaintiff, told him ‘get your ass off my job,’ and knocked him severely to the ground. WALTON then straddled the plaintiff and began to pummel him with both fists until an off-duty policeman stopped him. He was ‘beating the hell out of’ the plaintiff until the police officer pulled him off.
“LASSITTER never struck a blow nor offered the slightest provocation. The beating he received was described by witnesses as ‘flailing the tar out of him,’ leaving his head ‘all cut-up, beat-up, bruises, knots, cuts.’ It also left him with a permanent hearing loss.
“After the beating, on the same day, WALTON bragged about what he had done, stating LASSITTER ‘didn’t believe what I told him whenever I told him to stay off the job, and he came back on the job, so I took care of him.’ ” Brief for Appellee at 8 (1973).

. It may be inferred from the testimony that the agreement was with the Local.

. Article XXIII, Subdivision 11, Relations with Employers, reads:
“No action shall he taken hy any Local Union, Local Executive Board, Officer, Committee or Business Representative, of a Local Union affecting the relations between am employer and the Local Union or its members unless authorized as hereinafter provided. * * * *
If no settlement of the dispute has been effected then the authority investigating the facts connected with said dispute may, if vested with the power so to do, immediately order and direct any necessary action deemed as required under the circumstances, through the removal of the member or members affected, through strike or by stoppage of all work, or by securing a strike of all such other trades and workmen as can be obtained.” (Emphasis added.)

. An appendix to the brief of the local union contains fourteen newspaper articles of moderate length which were published at various times during the trial. The articles discuss events leading to the trial and the trial progress. Some of the article headlines were: “Union Harassment Claimed in Trial,” and “More Testimony Given On Union Violence.”

. The trial itself brought heated exchanges. The trial court judge admonished one attorney for calling a witness a liar, was provoked to the point of threatening to jail a union attorney and the jury heard evidence during the trial .of union harassment of a union member who testified for Lassitter.

. Florida Standard Jury Instruction 6.12:
“PUNITIVE DAMAGES
“If you find for claimant and find also that the defendants . . . acted with malice, moral turpitude, wantonness, wilfulness or reckless indifference to the rights of others, you may, in your discretion, assess punitive damages against such defendants as punishment and as a deterrent to others. If you find that punitive damages should be assessed against any defendant, you may consider the financial resources of such defendant in fixing the amount of such damages . . .

. F.R.C.P. 1.280 (1974) et seq., 30 F.S.A.