Sally HECHLER, Plaintiff-Appellant,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, an unincorporated association, Local 759 of the International Brotherhood of Electrical Workers, AFL–CIO System Council U–4, an unincorporated association, Defendants-Appellees.

No. 84–5799.

United States Court of Appeals, Eleventh Circuit.

Sept. 30, 1985.
Rehearing and Rehearing En Banc Denied Nov. 14, 1985.

Before HENDERSON and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

CLARK, Circuit Judge:

This case raises important questions concerning an individual union member's right to sue a union for its alleged negligent acts and whether such a suit can be maintained in state court without violating the doctrine of federal preemption as concerns the National Labor Relations Act (NLRA) and the Labor Management Relations Act (LMRA). Plaintiff was an electrical apprentice with Florida Power & Light (FPL), and a member in good standing with the International Brotherhood of Electrical Workers (IBEW) and its local affiliate. On January 11, 1982, FPL assigned her to a job which she alleges was beyond the scope of her training. On that day, plaintiff sustained injuries while performing work within the scope of her employment. Plaintiff sued the IBEW and its local affiliate, alleging they were negligent in both training and providing her with a safe work place. The gravamen of plaintiff's complaint is that the unions breached a duty owed to her to assure that she was "provided safety in her work place and a safe work place, and further, the plaintiff would not be required or allowed to take undue risks in the performance of her duties which were not commensurate with her training and experience or to work in an area which was not safe as commensurate with her training and experience." In sum, plaintiff alleged that the union had a duty to ascertain that she had had the essential training, background, education, and experience before being assigned to work in an inherently dangerous work place such as an electrical

substation, and that the union breached that duty.[1]

The district court found that the duty allegedly owed to the plaintiff flowed from the collective bargaining agreement which imposed a duty on the union to monitor the safety and training of its members. The district court held that the union's failure to monitor the employee's work place constituted a breach of its duty of fair representation. The court further held that the plaintiff had failed to demonstrate that the union's allegedly negligent activity was unrelated to the collective bargaining agreement or beyond the scope of the employee/union fiduciary relationship. Consequently, the district court ruled that plaintiff's suit was based on federal labor law and that the suit had been properly removed from state to federal court. Finding that federal law applied, the district court then looked to § 10(b) of the Labor Management Relations Act, 29 U.S.C.

§ 160(b), which sets a six-month statute of limitation for suits alleging an unfair labor practice. The court noted that the Supreme Court in *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) had applied the six-month limitations period of § 10(b) to a hybrid § 301/fair representation suit brought by an employee against his employer and union. Plaintiff here filed her suit in state court over two years after she sustained her injury. The district court found that the rationale of *DelCostello* applied to plaintiff's case because her suit was based upon the union's breach of its duty of fair representation. Accordingly, the district court dismissed the suit for failure to comply with the federal statute of limitations.

We reverse and remand for the district court to remand the case to the state court, finding that plaintiff's complaint on its face states a common law negligence claim that

1. The agreement between FPL and the IBEW provided in pertinent part:

45. Safety
(a) The safety of the employees is a matter of paramount importance, shall receive first consideration, and no employee shall be allowed or required to take any undue risk in the performance of his duties which he or his Foreman or Supervisor consider unsafe to himself or his fellow workers. Supervisors and Foremen will be held strictly responsible for the enforcement of safe working rules.

MISCELLANEOUS
The Manner an Electrical Apprentice Will Work

It is recognized that an Electrical Apprentice is in training under Journeymen to become a qualified Journeyman. It is also recognized that as he progresses in his apprenticeship, he becomes qualified to perform productive work, and will be expected to perform all the duties of a Journeyman which he has become qualified to do. It is not the intention of the Company to use an Apprentice on any type of work which the Apprentice has not become qualified to perform through experience and training. In this regard, the Company will not require an Apprentice to work on, climb through or work above energized conductors carrying more than 500 volts during his first year of apprenticeship.

After completing his first year, the determination of whether the Apprentice is qualified to work on conductors carrying more than 500 volts will be made by the Apprentice

himself, the Foreman supervising the Apprentice, and the Journeyman with whom he works. Should any question arise as to whether or not he is qualified to perform the duties assigned to him, which cannot be resolved locally it shall be brought to the attention of the Supervisor of Apprentice Training, who will investigate the qualifications of the Apprentice and report his findings to the Joint Apprenticeship Committee for determination as to whether the Apprentice is qualified to perform the work in question.
. . . .

MISCELLANEOUS
The Manner an Electrical Apprentice Will Work

It has come to the attention of the Apprentice Committee that the "Memorandum of Understanding as to the Manner an Electrical Apprentice Will Work" is being interpreted in some locations that after an Apprentice has the required first year of apprenticeship, he can be required to work on conductors carrying more than 500 volts. The Memorandum clearly provides that the determination of whether an Apprentice is qualified to work on conductors carrying more than 500 volts will be made by the Apprentice himself, the Foreman supervising the Apprentice, and the Journeyman with whom he works. Even if the Apprentice has more than the first year as an Apprentice, the above determination must be made. In arriving at the first year of apprenticeship, the time in classification plus credit allowed for related experience is to be used.

may be cognizable in state court and is not preempted by the federal labor laws.

### General Principles Involving Federal Preemption Under The NLRA And LMRA

In conferring broad powers upon the National Labor Relations Board (NLRB) to interpret and enforce the NLRA, Congress did not specify the extent to which existing state regulation was preempted. Thus, the breadth of preemption mandated by the NLRA was left to interpretation by the courts.

In *Garner v. Teamsters Union*, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), the Court held that a state court was not empowered to enjoin union picketing instituted in an attempt to organize a company's employees, where there was no observable threat to public safety. The question presented to the Court was whether "the State, through its courts, may adjudge the same controversy and extend its own form of relief" when resolution of such controversy falls within the jurisdiction of the NLRB. *Garner*, 346 U.S. at 489, 74 S.Ct. at 165. The Court found the state's action preempted: "Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies," because a "multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are· different rules of substantive law." *Garner*, 346 U.S. at 490–91, 74 S.Ct. at 166.

The next year in *United Construction Workers v. Laburnum Construction Corp.*, 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954), the Court allowed a state tort action brought by a company against a union on the basis of asserted threats of violence accompanying the union's demand that the company recognize the union as the sole bargaining agent for its employees. Although recognizing that the conduct sued upon also violated § 8 of the Act, creating an administrative remedy before the board, the Court found *Garner* distinguishable because in that case the state's injunctive procedures conflicted with the administrative remedy available before the board, while in *Laburnum* Congress had provided no administrative substitute for the remedy available under state law.

Here Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct. For us to cut off the injured respondent from this right of recovery will deprive it of its property without recourse or compensation. To do so will, in effect, grant petitioners immunity from liability for their tortious conduct. We see no substantial reason for reaching such a result.

. . . .

To the extent that Congress prescribed preventive procedure against unfair labor practices, [*Garner*] recognized that the Act excluded conflicting state procedure to the same end. To the extent, however, that Congress has not prescribed procedure for dealing with the consequences of tortious conduct already committed, there is no ground for concluding that existing criminal penalties or liabilities for tortious conduct have been eliminated. The care we took in the Garner case to demonstrate the existing conflict between state and federal administrative remedies in that case was, itself, a recognition that if no conflict had existed, the state procedure would have survived. The primarily private nature of claims for damages under state law also distinguishes them in a measure from the public nature of the regulation of future labor relations under federal law.

*Laburnum*, 347 U.S. at 663–64, 74 S.Ct. 837–38.

Significantly, in permitting the state court suit, the Court made the following observation on the purposes behind the Labor Management Relations Act (LMRA):

The 1947 Act has increased, rather than decreased, the legal responsibilities of labor organizations.... The fact that it prescribed new preventive procedure against unfair labor practices on the part of labor organizations was an additional recognition of congressional disapproval of such practices. Such an express recognition is consistent with an increased insistence upon the liability of such organizations for tortious conduct and inconsistent with their immunization from liability for damages caused by their tortious practices.

*Laburnum*, 347 U.S. at 666–67, 74 S.Ct. at 839 (footnote omitted).

In *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Court reiterated the preemption doctrine but outlined two general exceptions to preemption. In *Garmon* the employer had refused the union's request to enforce a closed-shop, leading the union to begin picketing his place of business. The employer brought suit in California Superior Court and was granted an injunction plus $1,000 in damages. The Supreme Court reversed, finding that state court jurisdiction is preempted "[w]hen it is clear or may fairly be assumed that the activities which a state purports to regulate are protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield." *Garmon*, 359 U.S. at 244, 79 S.Ct. at 779. However, the Court in *Garmon* also announced two limited exceptions to the preemption doctrine, "where the activity regulated was a merely peripheral concern of the Labor Management Relations Act .... [o]r where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the states of the power to act." *Garmon*,

359 U.S. at 243–44, 79 S.Ct. at 779 (citation and footnote omitted).

More recently in *Farmer v. United Brotherhood of Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) the Court allowed an employee's state action against his union for intentional infliction of emotional distress, in the form of personal abuse and harassment because of dissident political activity. Acknowledging the central question posed in *Garmon*, whether the activities are protected by § 7 or prohibited by § 8, the Court noted its previous refusal to apply the preemption doctrine to activities otherwise within the scope of the LMRA if such activities were merely of peripheral concern to the Act, or involved interests so deeply rooted in local concern that in the absence of compelling congressional direction it would be improper to infer that Congress had deprived the states of their power to act. *See Farmer*, 430 U.S. at 296–97, 97 S.Ct. at 1061. Thus, a review of relevant Supreme Court precedent establishes three factors that must be present before state courts may assert jurisdiction and avoid federal preemption; (1) the state action must be of peripheral concern to federal labor law; (2) the state action must involve conduct in which a state has an overriding interest and which is deeply rooted in local concern; and (3) there must be little risk that the state cause of action will interfere with the effective administration of federal labor policy.

In analyzing whether federal preemption applies to the case *sub judice*, we must determine whether plaintiff's complaint essentially alleges either an unfair labor practice or duty of fair representation claim, or a breach of contract claim under § 301.

*Federal Preemption under § 301*

Turning first to the availability of a breach of contract claim under § 301,[2] plaintiff admits that such a remedy may

---

**2.** Section 301(a) reads:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect

have been available to her but asserts that her complaint sounded in tort not contract, and that a § 301 suit would not provide the full measure of compensatory damages available under state law. We find ourselves in agreement with plaintiff, for nothing in § 301, with the possible exception of back wages, provides the plaintiff with the full measure of damages available in tort. Nor does the fact that a state action may in part involve the same relief available under § 301 mandate preemption. As stated by the Supreme Court in *International Union, United Automobile Workers v. Russell*, 356 U.S. 634, 78 S.Ct. 932, 21 L.Ed.2d 1030 (1958):

> In this case there is a possibility that both the Board and the state courts have jurisdiction to award lost pay. However, that possibility does not create the kind of "conflict" of remedies referred to in Laburnum. Our cases which hold that state jurisdiction is pre-empted are distinguishable. In them we have been concerned lest one forum would enjoin, as illegal, conduct which the other forum would find legal, or that the state courts would restrict the exercise of rights guaranteed by the Federal Acts.
>
> In the instant case, there would be no "conflict" even if one forum awarded back pay and the other did not. There is nothing inconsistent in holding that an employee may recover lost wages as damages in a tort action under the state law, and also holding that the award of such damages is not necessary to effectuate the purpose of the Federal Act.

*Id.* at 644–45, 78 S.Ct. at 938–39 (footnote omitted).

Nor would plaintiff's state action run afoul of the Supreme Court's recent pronouncement in *Allis-Chalmers Corp. v. Lueck*, —— U.S. ——, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), where the Court stated: "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, *see Avco Corp. v. Aero Lodge 735*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), or dismissed as preempted by federal labor-contract law." *Id.*, 105 S.Ct. at 1916. The respondent in *Allis-Chalmers* had brought a state action for the bad-faith handling of an insurance claim arising out of a disability insurance plan included in a collective bargaining agreement. Though respondent's claim constituted a tort under Wisconsin law, the collective bargaining agreement had established a disability grievance procedure that culminated in final and binding arbitration. When the dispute arose over the insurer's handling of respondent's disability claim, he brought a tort suit against petitioner in state court rather than utilizing the grievance procedure.

The Court found that respondent's tort suit was preempted because "[u]nder Wisconsin law, the tort intrinsically relates to the nature and existence of the contract. *Hilker v. Western Automobile Ins. Co.*, 204 Wis. 1, 13–16, 235 N.W. 413, 414–15 (1931). Thus, the tort exists for breach of a 'duty devolve[d] upon the insurer by reasonable implication from the express terms of the contract,' the scope of which, crucially, is 'ascertained from a consideration of

to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185.

While the great majority of cases brought under § 301 are suits by unions against employers to enforce the terms of a collective bargaining agreement, it is now undisputed that an individual employee may bring suit under § 301:

> The concept that all suits to vindicate individual employee rights arising from a collective bargaining contract should be excluded from the coverage of § 301 has thus not survived. The rights of individual employees concerning rates of pay and conditions of employment are a major focus of the negotia-

tion and administration of collective bargaining contracts. Individual claims lie at the heart of the grievance and arbitration machinery, are to a large degree inevitably intertwined with union interests and many times precipitate grave questions concerning the interpretation and enforceability of the collective bargaining contract on which they are based.

*Smith v. Evening News Association*, 371 U.S. 195, 200, 83 S.Ct. 267, 270, 9 L.Ed.2d 246 (1962). Moreover, an individual employee may sue the union for a breach of its contractual obligation. *See Farmer, supra*, 430 U.S. at 303 n. 12, 97 S.Ct. at 1065 n. 12.

the contract itself.' *Id.* at 16, 235 N.W. at 415." *Allis-Chalmers*, 105 S.Ct. at 1914. Thus, the Court concluded that: "Because the right asserted not only derives from the contract, but is defined by the contractual obligation of good faith, any attempt to assess liability here inevitably will involve contract interpretation.... Congress has mandated that federal law govern the meaning given contract terms. Since the state tort purports to give life to these terms in a different environment, it is pre-empted." *Id.* at 1915.

The difference between *Allis-Chalmers* and the instant case is easily seen. In *Allis-Chalmers*, the tort was essentially a product of the contract itself—without the contract no tort claim could have existed. Moreover, the collective bargaining contract itself provided the remedy—arbitration—for a breach. Here, plaintiff's claim is essentially one of common law negligence for breach of a duty of care. Neither the collective bargaining agreement nor § 301 provides a remedy. Though the contract may be of use in defining the scope of the duty owed, liability will turn on basic negligence principles as developed by state law. Moreover, the Court in *Allis-Chalmers* emphasized that its holding was not meant to have preclusive effect on all tort suits arising out of a labor agreement.

> It is perhaps worth emphasizing the narrow focus of the conclusion we reach today. We pass no judgment on whether this suit also would have been pre-empted by other federal laws governing employment or benefit plans. Nor do we hold that every state-law suit asserting a right that relates in some way to a provision in a collective-bargaining agreement, or more generally to the parties to such an agreement, necessarily is pre-empted by § 301. The full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis.

*Allis-Chalmers*, 105 S.Ct. at 1916.

### Federal Preemption and the Duty of Fair Representation

In determining whether plaintiff's suit is preempted because it asserts no more than an unfair labor practice claim or a duty of fair representation claim, we first turn to *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) where the Supreme Court stated that a union breaches its duty of fair representation when it treats an individual in an arbitrary, discriminatory, or bad faith manner. *Id.* at 190, 87 S.Ct. at 916. In establishing the requisite bad faith conduct more than mere negligence must be shown. *See Vaca, supra*, 386 U.S. at 194–95, 87 S.Ct. at 919; *Harris v. Schwerman Trucking Co.*, 668 F.2d 1204, 1206 (11th Cir.1982).

Several cases provide guidance on the question of whether a suit for negligence against a union can be no more than a duty of a fair representation claim and therefore is preempted by federal law. In *Bryant v. UMW*, 467 F.2d 1 (6th Cir.1972) *cert. denied*, 410 U.S. 930, 93 S.Ct. 1370, 35 L.Ed.2d 592 (1973), the plaintiff brought suit against the union for its negligent failure to enforce a mine safety provision in the collective bargaining agreement. The provision at issue in the collective bargaining agreement called for the creation of a mine safety committee to be selected by the local union. The provision provided that the mine safety committee "may inspect" the mine and report its findings and recommendations to the management. *Bryant*, 467 F.2d at 4 n. 3. However, the union acted only in an advisory capacity and the enforcement of the mine's safety regulations was left to a grievance and arbitration process. Thus, the Sixth Circuit held that the union in this instance had not undertaken any duty beyond its usual duty of fair representation. *Bryant*, 467 F.2d at 5. The principal basis for the court's decision was that the union under the contract had not undertaken any affirmative duty to inspect the mines for its members benefit. In the case *sub judice*, the plaintiff alleges that the union had a specific duty to determine her fitness to confront and work with the dangers inherent in the job to which she was assigned.

In *Helton v. Hake*, 386 F.Supp. 1027 (W.D.Mo.1974), the survivors of a deceased

employee brought a state action against the union asserting negligence by the union in its violation of a duty imposed by the collective bargaining agreement to assure that no iron work was performed near high-tension power lines. Finding in the plaintiffs' complaint no allegation of a breach by the union of its duty of fair representation, and in the absence of any charge of arbitrary or discriminatory conduct, the court allowed the state action as the only available means of redress for the plaintiffs. *Id.* at 1030–31. Moreover, the court found that the contract had imposed upon the union an affirmative duty to enforce safety rules:

> In the instant case, taking the allegations contained in the complaint as true, the contract did impose upon the defendant union an affirmative duty to enforce safety rules. The complaint alleges that the union, through its agent, the steward, negligently and carelessly failed to enforce the safety rules relating to work in the area of high tension power lines. The suit is clearly brought as an action in tort seeking recovery for wrongful death due to the alleged negligence of the defendants. The only relevance of the collective bargaining agreement appears to be that it would determine, to some extent at least, the nature and scope of defendants' duty. That defendants' duty may have arisen under a contract does not in and of itself change the basic nature of this action, which is a suit in tort to recover damages for injuries sustained due to defendants' alleged negligence.

*Id.* at 1031. The court went on to find that the complaint could not properly be construed as a suit for violation of a collective bargaining agreement under § 301:

> Merely because some interpretation of the contract appears to be necessary to the determination of the nature, scope or extent of the duty owed does not, in and of itself, categorize this cause as an action for violation of the contract so as to grant jurisdiction to this Court under Section 301(a). ... [T]his Court cannot conclude that this negligence action to recover damages for wrongful death falls within Section 301's ambit. Plaintiffs herein are not praying for reinstatement or back wages, or for an improvement in working conditions.

*Id.* at 1033–34 (citations omitted).

Another case which utilized a similar analysis is *Dunbar v. United Steelworkers of America,* 100 Idaho 523, 602 P.2d 21 (1979), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980), where the court upheld a wrongful death action against the union for negligence in breaching its contractual obligations regarding mine safety. The court distinguished the Sixth Circuit's *Bryant* decision on the ground that no contractual duty was found in that case whereas in *Dunbar,* the collective bargaining agreement mandated that the union "shall inspect" the mine. *Dunbar,* 602 P.2d at 26.

However, in a suit arising out of the same accident as in *Dunbar, House v. Mine Safety Appliance Co.,* 417 F.Supp. 939 (D.Idaho 1976), the district court refused to allow a negligence action finding that the asserted grounds of liability depended entirely upon the contract, that the safety of working conditions was a cornerstone of the union movement, and thus the suit was for a breach of the collective bargaining agreement and preempted by § 301. *Id.* at 944. The court in *House* went on to state, "[i]n light of the collective bargaining agreement in this case, a theory of common law negligence for breach of an alleged safety duty is inextricably intertwined and embodied in the union's duty of fair representation." *Id.* at 945 (footnote omitted). Finally, the court found that policy considerations dictated federal preemption of common law negligence suits against unions because of the following two factors: (1) punishing unions for failing to assure compliance by the company with safety provisions called for in the collective bargaining agreement would undermine the incentive of employers to comply with such agreements; and (2) imposing such liability would discourage unions from

including such safety standards in collective bargaining agreements. *Id.* at 946.

These policy considerations were subsequently embraced by the First Circuit in *Condon v. Local 2944, United Steelworkers of America,* 683 F.2d 590 (1st Cir.1982) where the court refused to allow a negligence suit against a union for its alleged failure to properly perform its safety monitoring function. The court concluded that "a union cannot be held liable for the negligent performance of a duty it assumed that arose inextricably, as here, from the safety and health provisions of a collective bargaining agreement." *Condon,* 683 F.2d at 595.[3]

■ The conflicting case law outlined above indicates that there are two key issues which must be addressed in determining whether a common law negligence suit is available against a union. First, a court must determine whether the duty allegedly breached by the union is so inextricably intertwined with the collective bargaining agreement that only a duty of fair representation claim is available, thereby preempting any claim for a common law tort. Second, in making this determination, a court must be aware of federal labor policy and whether a negligence suit against a union impermissibly impedes upon the federal labor-management regulatory scheme.

With regard to the latter concern, the primary inquiry is whether the duty sought to be enforced against the union in the negligence suit is so tangential and remote to the federal scheme that the suit is properly exempted from the preemption rule. *See Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). Our balancing of the relevant factors leads us to conclude that plaintiff's negligence claim is not preempted.

■ First, we note that the duty of fair representation is designed "to enforce fully the important principle that no individual union member may suffer invidious, hostile treatment at the hands of the majority of his co-workers." *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971). We are aware of no authority which indicates that a duty of fair representation displaces those duties created by state law which prohibit a person or corporation from engaging in tortious conduct resulting in death or injury to a person or property. For instance, nothing in the federal scheme, either directly or by implication, protects a union's negligence in the training or assignment of one of its members anymore than it protects libel, violent tortious activity, or intentional infliction of emotional distress.[4] Moreover, nothing in the statutory scheme expressly addresses such conduct, or provides a mechanism for

3. We note that *Bryant* and *Condon* are distinguishable from the instant case because both involved the determination of fitness of the work place. This area has traditionally been a company function, and as *Bryant* and *Condon* demonstrate, recent union involvement has primarily been in an advisory capacity.

However, in the case *sub judice* the fitness and training of a worker to perform a specified task is at issue, a determination that has traditionally fallen within the realm of the union as demonstrated by the journeymen system. Indeed, the union in establishing a hierarchy of skilled positions, utilizes its expertise in determining the relative qualifications of its individual members. Petitioner alleges that under the collective bargaining agreement, the union had a contractual obligation to properly train her and that her injuries on the job resulted from the union's tortious breach of this obligation. Unlike the

mine safety cases discussed *supra,* there is no allegation here that the union and company shared joint responsibility for worker training. However, the collective bargaining agreement between FPL and the IBEW is not entirely clear on who bears ultimate responsibility for worker training and safety. However, this does not relate to the preemption issue, which is the only issue decided by this opinion.

4. *See Sears, Roebuck and Co. v. San Diego County District Council of Carpenters,* 436 U.S. 180, 196 n. 25, 98 S.Ct. 1745, 1757 n. 25, 56 L.Ed.2d 209 (1978); *Farmer v. United Brotherhood of Carpenters, supra,* 430 U.S. at 299, 97 S.Ct. at 1063; *Linn v. United Plant Guard Workers,* 383 U.S. 53, 61–62, 86 S.Ct. 657, 662–63, 15 L.Ed.2d 582 (1966); *United Construction Workers v. Laburnum Construction Corp., supra,* 347 U.S. at 664–65, 74 S.Ct. at 837–38.

its redress. Likewise, it cannot be said that by failing expressly to protect or prohibit acts of negligence by unions, Congress intended to permit unions to engage in negligent acts free of the scrutiny of state courts. Rather, it is far more likely that Congress "by silence indicate[d] a purpose to let state regulation be imposed...." *Retail Clerks International Association v. Schermerhorn,* 375 U.S. 96, 104, 84 S.Ct. 219, 223, 11 L.Ed.2d 179 (1963) (citing *Florida Avocado Growers v. Paul,* 373 U.S. 132, 141–43, 83 S.Ct. 1210, 1216–18, 10 L.Ed.2d 248 (1963)).

■ Nor is the union's contractual duty to assure worker training as a prerequisite to the assignment of the worker to an area of danger inextricably intertwined with its federal duty of providing fair representation to its members. The district court below found that Hechler had failed to "demonstrate that the union's allegedly negligent activity was unrelated to the collective bargaining agreement or beyond the scope of the employee/union fiduciary relationship." *Record Excerpt* at 14. This requirement is far too onerous, for all of the cases on this subject involve conduct which is related to the collective bargaining agreement. Otherwise, there would be no preemption issue at all. Further, this claim does not grow out of "the employee/union fiduciary relationship." The question is whether the challenged activities are beyond the central scope of the federal regulatory scheme, not beyond the scope of the employee/union relationship. That question is satisfied in this case because the conduct at issue is not prohibited nor protected by the federal scheme. As previously discussed, the plaintiff has no duty of fair representation action against the union since this complaint does not allege that the union failed to properly represent plaintiff in a claim against the employer. Moreover, the fact that some reference to a collective bargaining agreement must be made in order to define the scope of the union's duty does not automatically lead to the conclusion that a suit in negligence

must be interpreted as no more than a § 301 action and therefore is preempted. As noted by the district court in *Helton v. Hake,* 386 F.Supp. 1027, 1033 (W.D.Mo. 1974), to adopt such a view,

> would lead to the inescapable conclusion that any case in which interpretation of a collective bargaining agreement may be involved vest jurisdiction in the federal district courts under Section 301(a), regardless of the actionable wrong complained of or the relief sought, or how directly or indirectly related the collective bargaining agreement is to the action.

*Id.* at 1033.

■ The next question is whether a state court's adjudication of the claim would threaten interference with the federal scheme. As previously noted even if the state action threatens adjudication of matters cognizable by the board or by a court adjudicating federal labor law, the state action may be permissible if only peripherally related to the federal scheme or is deeply rooted in the state's concerns. *See Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, supra,* 436 U.S. at 188 n. 13, 98 S.Ct. at 1753 n. 13; *Farmer v. United Brotherhood of Carpenters, supra,* 430 U.S. at 296–97, 97 S.Ct. at 1061–62. Thus, even if the state action threatens some potential interference with the regulatory scheme, this court must balance the extent of that threat against the importance of the action to the state. We find no impermissible conflict with the federal regulatory scheme in this case because there is no realistic threat that the state court will adjudicate any significant matters cognizable either by the board or by a federal or state court adjudicating a federal cause of action arising under the labor laws. We emphasize at this point the narrow scope of our holding. We decide this case on the facts presented. This case is distinguishable from the cases previously described [5] in which the plaintiff sought relief from the union for a breach of its general duty to inspect for safety for

---

5. See pages 794–96, *supra,* and discussion of

*Bryant, Helton, Dunbar, House,* and *Condon.*

the benefit of the entire work force in the workplace pursuant to the collective bargaining agreement. We will wait until a later date to decide the issue presented to the courts in *Bryant, Dunbar,* and *Condon.* In the present case the plaintiff alleges a duty running from the union to her individually that required the union to assure that she was first qualified to work in a dangerous electrical substation on the job assigned to her prior to her assignment. The plaintiff does not claim the union was responsible for making the substation safe for all of the workers.

The State of Florida has a strong interest in redressing negligent conduct, not only for the personal benefit of the plaintiff but also for the public safety as well. It can be argued that the Supreme Court's opinions have focused primarily upon state law claims of outrageous conduct and that the claim in this case is less important than the interest in public safety and order which the court has invoked in permitting state actions to prevent or redress potentially violent conduct. *See San Diego Building Trades Council v. Garmon, supra,* 359 U.S. at 247–48, 79 S.Ct. at 780–81, (citing *United Construction Workers v. Laburnum Construction Corp., supra* ). However, the same lesser status could be assigned to the state's interest in redressing defamation or the intentional infliction of emotional distress, two causes of action which concern primarily personal as opposed to public injury; which the court has also permitted. *See Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, supra,* 436 U.S. at 196 n. 25, 98 S.Ct. at 1757 n. 25 (citing *Farmer v. United Brotherhood of Carpenters, supra* ). Additionally, the Supreme Court in *Farmer* spoke generally about the state's interest in protecting its citizens and in referring to defamation cases like *Linn v. United Plant Guard Workers, supra,* has ascribed to the states an interest in preventing defamation no less strong than its interest in protection from physical injury. *Farmer, supra,* 430 U.S. at 302, 97 S.Ct. at 1064–65.

The next aspect of our analysis turns to the concern that holding a union liable for its negligent acts would disrupt labor relations policy and would discourage unions from undertaking affirmative safety responsibilities in collective bargaining agreements. As stated by the court in *House:*

> To permit a sanction of legal liability to accompany a union's exercise of responsibility in safety matters, together with either loss shifting or sharing, would weaken the duty of the employer at the expense of the union and its members. Union funds are derived from its members and only the largest unions may be potentially able to absorb the type of loss involved in this case. While unions may seek insurance coverage, the cost must be borne by the membership. Unions do not have finite limits of liability as do employers under workmen's compensation, nor can unions pass along such a loss to the public as may an employer. Moreover, the result is readily apparent, if unions could be held liable in cases such as this—there would be no negotiation on safety matters. To impose liability on the union in a case such as this is against public policy and would seriously disrupt labor relations policy.

*House,* 417 F.Supp. at 946–47 (footnotes omitted). Likewise, the Sixth Circuit in *Bryant v. Mine Workers, supra,* stated:

> This Court is not unfamiliar with the difficult and longstanding problem of ensuring safety in the coal mines of this country.... The answer to [this] problem is not to pervert the collective bargaining process by reading into its instruments a liability which was never contemplated and duties which were never assumed in fact or in theory. To saddle labor unions with liability for the mine operators' failure to comply with standards introduced into the contract at the union's bidding would simply be to discourage the inclusion of similar and more effective standards in later contracts. Such result would not serve the interest of miners and would retard rath-

er than advance the goals of the National Labor policy.

*Bryant,* 467 F.2d at 5–6 (footnote omitted).

While these arguments are persuasive, we have previously pointed out the distinction between this case which does not claim the union is responsible for the safety of the workplace and those cases which do. This case cannot be said to intrude upon federal labor policy. The history of the development of craft workers has involved training of apprentices, promotions to journeymen and then to craftmen based on experience and expertise. Unions have protected seniority and differential wage rates based on this system. In this case the union is charged with the responsibility of assuring that the worker can cope with the dangers inherent in the workplace. The undertaking of this responsibility is between the union and the worker and does not implicate national labor policy.

As we have demonstrated, the duty of fair representation has nothing directly to do with training for job safety. It is concerned with arbitrary or discriminatory conduct toward individual employees, which is violative of the union's statutory obligations inherent in its status as a bargaining representative for the worker. That the duty of fair representation has no direct relation to training for job safety is evidenced by the fact that plaintiff in this case does not have a cause of action for breach of a fair representation duty. The balancing undertaken by the *House* and *Bryant* courts essentially involved a policy making/legislative function which balanced the pros and cons of a state's attempt to proscribe a union's negligence regarding job safety. Admittedly, these courts concluded that allowing suits for negligence have a negative impact upon federal labor policy. However, these conclusions were reached without properly focusing on the issue involved in any preemption analysis, that is, is the activity which the state seeks to regulate an activity that Congress has delegated to the board or the state and federal courts under federal labor law. As we have discussed above, tortious conduct by a union against one of its members is simply not an activity that falls within the exclusive realm of federal labor law. Accordingly, we refuse to find that this policy rationale alone is sufficient to warrant preemption of the plaintiff's negligence suit.

 Returning to the plaintiff's complaint we find that its allegations against the union sound in tort law and do not make out a duty of fair representation/§ 301 claim. Accordingly, because federal labor law was not invoked in plaintiff's complaint, the federal court lacks jurisdiction and removal was improvidently granted by the district court. We direct that the case be remanded to the state tribunal for adjudication on the merits. What we have discussed herein relates only to the preemption issue and we intimate no opinion with respect to the sufficiency of the complaint.

REVERSED and REMANDED.