Jay CANNON, Thomas Carey, Stevie Powell and Service Employees International Union, Local 106, AFL–CIO, for itself and on behalf of its members, Plaintiffs,

v.

James EDGAR, Governor of Illinois, Roland W. Burris, Attorney General of Illinois, Schwarzbach Cemetery Co., Barnett Joseph and Son, Inc., and Silverman & Weiss, Inc., Defendants.

No. 92 C 8340.

United States District Court, N.D. Illinois, E.D.

July 13, 1993.

**1352**

J. Peter Dowd, Robert E. Bloch, Linda Wyetzner, Dowd & Bloch, Chicago, IL, for plaintiffs.

James R. Carroll, Roger Philip Flahaven, Jonathan Clark Green, Illinois Atty. Gen. Office, Chicago, IL, for defendants James Edgar and Roland W. Burris.

Burton Joseph, Barsy, Joseph & Lichtenstein, Jack Joseph, Joseph, Susman & Myers, Chicago, IL, for defendants Schwarzbach Cemetery Co., Barnett Joseph and Son Inc. and Silverman & Weiss Inc.

### OPINION AND ORDER

NORGLE, District Judge:

Before the court are cross-motions for summary judgment. For reasons explained fully below, the court grants plaintiffs' motion and denies defendants' motion.

### FACTS

From December 20, 1991 until January 31, 1992, plaintiff Service Employees International Union, Local 106, AFL–CIO (the "Union") was involved in a labor dispute with twenty-six Chicago area cemeteries which delayed the performance of interment services at these cemeteries. The labor dispute began when the Union organized a strike of the cemeteries and escalated when the cemeteries responded with a lockout of all Union employees. As a consequence, the six-week labor dispute delayed many burials that otherwise would have been completed promptly as mandated by the religious tenets of some cemetery plot owners. For instance, the tenets and beliefs of many persons of the Jewish faith require burials on the first or second day after death, and defendants have identified two other religions requiring similar treatment: Islamic and Zoroastrian. During the 1991–92 labor dispute some interments were delayed for more than one month.

The labor dispute was subsequently resolved after a battle in state court and through agreement between the striking forces and the cemeteries.[1] In direct response to this labor dispute, the legislative body of the State of Illinois passed the Illinois Burial Rights Act (the "Burial Act"), P.A. 87–1174, which became law on September 18, 1992 through the signature of defendant Governor James Edgar. The Illinois General Assembly sought to remedy any possibility that a future labor dispute would stand in the way of the religious faith or burial practices of Illinois citizens.

After enactment of the Burial Act, plaintiffs Jay Cannon and Thomas Carey, the Union's Secretary–Treasurer and President, were concerned that the Burial Act would adversely affect the Union's pending negotiations over the terms of a new collective bargaining agreement. As a result, Jay Cannon, Thomas Carey, a union employee Stevie Powell, and the Union (collectively "plaintiffs") brought suit in December 1992 seeking an injunction against enforcement of the Burial Act and a declaration from this court pursuant to 28 U.S.C. § 2201 that the Burial Act was unconstitutional. The complaint alleges that the Burial Act requires the Union and all cemeteries having unions, including defendants Schwarzbach Cemetery Co., Barnett Joseph & Son, Inc., and Silverman & Weiss, Inc. ("defendant cemeteries"), to negotiate and enter into an agreement establishing a labor pool that must perform certain burials during the course of a strike or

---

1. A lawsuit was filed during the 1991–92 labor dispute which did not directly concern the labor dispute. The suit did not seek or obtain relief compelling the performance of interments. The suit arose from the cemeteries' refusal to allow families into the cemeteries to perform their own interments during the labor dispute. Union members voluntarily elected to perform these religiously required burials, although the state court judge specifically stated that the court's order would not require striking employees to return to work.

labor dispute. The complaint further maintains that the agreement establishing the labor pool must be entered into within 120 days of the effective day of the Burial Act, or by January 16, 1993. By agreed order dated January 11, 1993, the Governor and Attorney General of Illinois were enjoined from enforcing the Burial Act until this court passes on its constitutionality.

The Union is the exclusive bargaining representative on behalf of all persons performing interments and related work at all cemeteries located in the Northern District of Illinois and is recognized by the defendant cemeteries as the exclusive bargaining representative for all of their employees who perform interment work. The Union's members also provide an array of services involving the administration, maintenance, and upkeep of cemeteries, and the office and clerical employees of the defendant cemeteries are Union members as well. Secretary–Treasurer Jay Cannon and President Thomas Carey represent the Union in all dealings with employers concerning contracts, labor disputes, wages, and other terms and conditions of employment.

The three defendant cemeteries bargain collectively with the Union and are parties to a single collective bargaining agreement. Some of the defendant cemeteries sell interment services primarily or exclusively to families or representatives of decedents who are members of the Jewish faith. Of the approximately 172 cemeteries operated by the defendant cemeteries, forty percent of them are operated for or were founded by Jewish congregations. All of the interments at the defendant cemeteries are performed by Union members.

Around December of 1992, the plaintiffs and defendant cemeteries began negotiations over the terms of a new collective bargaining agreement. During these negotiations, the defendant cemeteries advised the plaintiffs that they intended to abide by the provision of the Burial Act and that they insisted the labor pool established pursuant to the Burial Act be comprised exclusively of Union-represented employees. The plaintiffs advised the defendant cemeteries that they considered the Burial Act to be illegal and "intolerable,"

and that the Union would not comply with its requirements.

The Burial Act reads as follows:

Sec. 2.1. Access to Interment Rights. (a) If the owner of an interment right in a cemetery or his or her legatees, executor or administrator desires to use that interment right for interment purposes, necessitated by the decedent's membership in a religious sect whose tenets and beliefs require burial within a specified period of time, and a labor dispute has resulted in a disruption of normal interment services at that cemetery, the owner of the interment right or his or her heirs and legatees, executor or administrator may arrange for the performance of the interment by notifying the cemetery authority and designating individuals to perform the interment; provided that such interment and all related work necessary to perform the interment is performed at the direction and under the supervision of the cemetery authority's management personnel and from a pool of workers established pursuant to an agreement between the cemetery authority and the appropriate labor union. An agreement establishing such pool of workers to provide for the religiously required interments as set forth in this Section shall be negotiated and entered into within 120 days of the effective date of this amendatory Act of 1992.

P.A. 87–1174. The Burial Act further provides for sanctions which include monetary fines and injunctive relief. Specifically, the Burial Act states:

(b) In the event of a violation of this Section, a court shall enter an injunction granting appropriate relief, including, in the case of a willful violation, an award of attorney's fees and the imposition of a fine not to exceed $1,000 for each interment which is found to have been delayed in violation of this Section. The failure of a cemetery authority or a labor union to negotiate in good faith to establish a pool of workers as provided in subsection (a) constitutes a willful violation of this Section for purposes of this subsection (b), but only if the failure to negotiate in good faith

results in the delay of a religiously required interment....

*Id.* Last, the Burial Act is "intended, as a matter of public policy, to apply only to burials required in a timely manner consistent with religious tenets and beliefs, and not to the labor dispute that would continue on beyond the limited scope of religiously required burials." *Id.* at § 2.2.

Plaintiffs claim the Illinois statute is unconstitutional for two distinct reasons. First, plaintiffs claim the statute is preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, *et seq.,* as amended by the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141, *et seq.,* and thus violates the Supremacy Clause of the United States Constitution. They assert that the Burial Act is preempted by Congress's regulation of the collective bargaining process and the rights protected by federal labor law. Secondly, plaintiffs claim that the Burial Act violates the Establishment Clause of the First Amendment of the United States Constitution. The court finds merit in the plaintiffs' first position and holds that the Burial Rights Act is preempted by federal labor law. Because the court finds the law preempted, it need not address whether the Burial Act violates the first amendment.

## DISCUSSION

■ Laws which Congress establishes pursuant to the constitution are "the supreme Law of the Land." U.S. CONST., art. VI, cl. 2. Consequently, state laws which conflict with federal law or that frustrate a federal regulatory scheme are preempted. *Building and Constr. Trades Council v. Associated Builders and Contractors, Inc.,* — U.S. —, —, 113 S.Ct. 1190, 1194, 122 L.Ed.2d 565 (1993). Additionally, if the totality of circumstances evidences that Congress intended to occupy a particular field of law to the exclusion of the states, then the state regulations are preempted. *Id.* The NLRA is undoubtably a law enacted pursuant to the Commerce Clause of the Constitution and is therefore supreme. *See NLRB v. State of Illinois Dep't of Employment Security,* 988 F.2d 735, 738 (7th Cir.1993). The principal questions are therefore whether the Burial Act conflicts or interferes with federal labor regulations such that the NLRA preempts its authority, or whether it is clear under the totality of the circumstances that Congress intended the present issues involving the collective bargaining process and striking to be entirely occupied by federal regulations to the exclusion of the states.

Two strains of federal labor preemption law guide this court's inquiry. The first is that articulated in *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). The second is that announced in *International Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Plaintiffs assert that the case is guided by *Machinists,* while defendants maintain that the plaintiffs' complaint implicates both doctrines. The court will address both.

### I. *Garmon* Preemption.

■ If a state statute regulates an activity that is either arguably or actually prohibited or is arguably or actually protected by the NLRA, then the statute is preempted. *Garmon,* 359 U.S. at 244–45, 79 S.Ct. at 779; *see Associated Builders,* — U.S. at —, 113 S.Ct. at 1194. *Garmon* was founded predominately on the concept of primary jurisdiction of the NLRB and on the need to avoid conflicting rulings on substantive labor rights. *See, e.g.,* JULIUS G. GETMAN & BERTRAND B. POGREBIN, LABOR RELATIONS: THE BASIC PROCESSES, LAW AND PRACTICE 340 (1988). But later decisions affirm that the doctrine of primary jurisdiction is the objection to state laws regulating conduct prohibited by federal law, while there exists a more direct constitutional objection where a state law interferes with conduct actually protected by federal labor law. *Brown v. Hotel & Restaurant Employees & Bartenders Int'l Union, Local 54,* 468 U.S. 491, 501, 104 S.Ct. 3179, 3185, 82 L.Ed.2d 373 (1984); *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 199–200, 98 S.Ct. 1745, 1758–59, 56 L.Ed.2d 209

(1978).[2] "Considerations of federal supremacy, therefore, are implicated to a greater extent when labor-related activity is protected than when it is prohibited." *Sears*, 436 U.S. at 199–200, 98 S.Ct. at 1758–59. Accordingly, federal law preempts state laws which regulate conduct actually protected by federal law "not. as a matter of protecting primary jurisdiction, but as a matter of substantive right." *Brown*, 468 U.S. at 503, 104 S.Ct. at 3186. The decision to preempt state regulation is thus not a mechanical application of *Garmon*, but depends upon "the nature of the particular interests being asserted" as well as the impact the regulation has "upon the administration of national labor policies...." *Sears*, 436 U.S. at 188–89, 98 S.Ct. at 1752–53 (quoting *Vaca v. Sipes*, 386 U.S. 171, 180, 87 S.Ct. 903, 911, 17 L.Ed.2d 842 (1967)).

Plaintiffs invoke *Garmon* preemption to the extent plaintiffs assert that the Burial Act infringes their right to strike, a right protected by the labor laws, and that the Burial Act compels the Union to negotiate a substantive collective bargaining term. Furthermore, the Burial Act punishes a union for its exercise of its bargaining rights, specifically for failing to negotiate the establishment of a replacement labor pool. Additionally, the jurisdictional concerns of *Garmon* are implicated because the Burial Act. provides a court forum for entertaining an action brought by aggrieved plot owners who observe a religious tenet requiring the prompt burial of deceased members against a labor union if the union is engaged in a strike that causes the delay of religiously required prompt burials.[3]

The answer to the *Garmon* preemption analysis can be gleaned by reference to *International Union of United Auto., Aircraft and Agric. Implement Workers v. O'Brien*, 339 U.S. 454, 70 S.Ct. 781, 94 L.Ed. 978 (1950) and *Amalgamated Ass'n of .Street, Elec. Ry & Motor Coach Employees v. Wisconsin Employment Relations Bd.*, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364 (1951). In .O'Brien, a state regulation that required a majority vote ·by union membership prior to striking was deemed preempted, *O'Brien*, 339 U.S. at 458, 70 S.Ct. at 783, and in ·*Amalgamated* the State of Wisconsin's attempt to restrict the ability of unions to engage in a· strike of public utilities was preempted, *Amalgamated*, 340 U.S. at 399, 71 S.Ct. at 368. Both cases recognized that § 7 of the NLRA protects the right of union employees to peaceably strike for higher wages. *O'Brien*, 339 U.S. at 457, 70 S.Ct. at 782; *Amalgamated*, 340 U.S. at 389, 71 S.Ct. at 362. Congress imposed some limitations on this right to strike, such as the provision of notice prior to strikes, prohibitions on strikes for certain objectives, and. special procedures for certain strikes tending to create national emergencies. *O'Brien*, 339 U.S. at 457, 70 S.Ct. at 782; *Amalgamated*, 340 U.S. at 389–90, 71 S.Ct. at 362–63. "None of these sections can be read as permitting concurrent state regulation of peaceful strikes for higher wages. Congress occupied this field and closed it to state regulation." *O'Brien*, 339 U.S. at 457, 70 S.Ct. at 782; *see also Division 1287 of the Amalgamated Ass'n of Street, Elec. Ry & Motor Coach Employees v. Missouri*, 374 U.S. 74, 81–82, 83 S.Ct. 1657, 1661–62, 10 L.Ed.2d 763 (1963) ·(state statute prohibiting peaceful strikes against public utilities preempted); *Weber v. Anheuser–Busch, Inc.*, 348 U.S. 468, 481, 75 S.Ct. 480, 488, 99 L.Ed. 546 (1955) (restraint of trade law's application to jurisdictional strike preempted).

■ Striking is an activity protected by federal labor law, and federal labor law establishes a right to bargain collectively. *See*

2. Although "care must be taken to distinguish pre-emption based on federal protection of the conduct in question ... from that based predominantly on the primary jurisdiction of the [NLRB], ... the two are often not easily separable." *Machinists*, 427 U.S. at 138, 96 S.Ct. at 2552 (quoting *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383 n. 19, 89 S.Ct. 1109, 1118 n. 19, 22 L.Ed.2d 344 (1969)). Either way, however, preemption involving activities that are *actually* protected remain covered under *Garmon*. *See Associated Builders*, —— U.S. at ——, 113 S.Ct. at 1194. In the court's view, the "*Brown* doctrine" discussed in the briefs is appropriately argued under *Garmon*.

3. The law also provides a remedy against cemeteries if the cemeteries are the cause of the delay.

29 U.S.C. § 157.[4] Under federal labor law, an employer may not force or coerce a union into establishing a pool of replacement workers or, during a strike, force or coerce a union into actually performing burials for people whose religious tenets require prompt burial. *See, e.g.,* 29 U.S.C. §§ 158(a)(1) & (d);[5] *Wesley v. I.T.O. Corp.,* 739 F.2d 683, 685 (1st Cir.1984) (unfair labor practice for employer to interfere with, coerce, or restrain statutorily protected employees in the exercise of collective bargaining rights). Because "Congress has protected the union conduct which the state has forbidden ... the state legislation must yield." *O'Brien,* 339 U.S. at 459, 70 S.Ct. at 783 (quoting *International Union, U.A.W., A.F. of L., Local 232 v. Wisconsin Employment Relations Bd.,* 336 U.S. 245, 252, 69 S.Ct. 516, 520, 93 L.Ed. 651 (1949)).

Defendants argue that the Burial Act does not prevent union workers from striking and thus does not violate the Union's right to strike. Because the Burial Act declares that its provisions "apply only to burials required in a timely manner consistent with religious tenets and beliefs," and do not apply "to the labor dispute that would continue on beyond the limited scope of religiously required burials," P.A. 87–1174 at § 2.2, defendants argue that striking is not affected. Also, defendants argue that plaintiffs perform other services and thus a strike would be effective even though interment services would be performed consonant with the Burial Act.

It is true the right of the Union to strike is not entirely abridged by the Burial Act, and a strike itself will not be ended by application of this law. But the Burial Act's injunction provision may force union employees to perform labor while, at the same time, federal law protects the right of union members to withhold their labor. Further, the Burial Act makes unlawful a strike that delays religiously required burials and imposes statutory fines. It also places a condition on striking (i.e., existence of a replacement pool) that was not contemplated by Congress. It is the concurrent regulation of the right to strike, through these many devices, that creates the preemption problem. *See O'Brien,* 339 U.S. at 457, 70 S.Ct. at 782.

Defendants argue that the labor pool does not have to consist of union workers and therefore the use of the labor pool to perform religiously required burials does not, by necessity, involve forcing striking workers to perform their duties. That may be true, but unions are not likely to negotiate a labor pool that does not consist of their own members because of the possibility of permanent replacement. The plaintiffs have already indicated that, as far as their agreements are concerned, any labor pool would consist exclusively of Union personnel. Additionally, the Burial Act explicitly contemplates that its enforcement runs against unions if they are the cause of the delay. The plain language of the Burial Act provides that "a court shall enter an injunction granting appropriate relief...." P.A. 87–1174 at § 2.1(b). The legislative history also reveals that the Illinois General Assembly "envision[ed] that the in-

4. Section 7 provides:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in *other concerted activities for the purpose of collective bargaining or other mutual aid or protection,* and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment....
 29 U.S.C. § 157.

5. Section 8(a)(1) provides:
 (a) It shall be an unfair labor practice for an employer—
 (1). to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

29 U.S.C. § 158(a)(1). Section 8(d) provides in relevant part:
 (d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession....
 29 U.S.C. § 158(d).

junction might run against ... the strikers" and would "prohibit [strikers] from their activities...." 87th Gen.Assembly, Reg.Sess., Senate Transcript, 108th Legislative Day, p. 124–25 (May 21, 1992). Thus, without a negotiated replacement labor pool, the injunction will directly run against union employees and will force them to perform the duties that were to be performed by this pool or may force them to allow others to cross their picket lines.

■ The coercive arm of the state is much like that of the employers in *NLRB v. Coca-Cola Co. Foods Div.*, 670 F.2d 84 (7th Cir. 1982), in which the Seventh Circuit found an unfair labor practice. Threatening to retaliate against employees in the exercise of their collective bargaining rights is impermissible even if the employees have not yet attempted or even contemplated exercising their rights under the NLRA. *See id.* at 86; *see also NLRB v. Gold Standard Enters.*, 679 F.2d 673, 676 (7th Cir.1982). Here, the threat comes directly from the state, which promises to provide punishment under certain circumstances for cemetery unions that strike. Under the Burial Act, an aggrieved plot owner need only show that a union strike was responsible for delaying a religiously required burial in order to impose an injunction or need only show a union did not negotiate a replacement labor pool in order to impose a statutory penalty. The law extends beyond merely allowing the families of deceased individuals to bury their dead, but forces the Union to provide the services or means necessary for the exercise of this right.

The defendants also argue that there are other remedies available short of enjoining the Union that a third party could utilize, or that the injunctions may never force Union employees to work but could provide some other "appropriate" method of remedying the problem. Nevertheless, the remedies provided for a union's failure to establish a labor pool for the purpose of providing religiously required burials prevents a union from carrying out its basic tasks in two ways. The statute makes actionable a union's refusal to bargain and reach an agreement on the existence and make-up of the replacement labor pool if such refusal results in a delay of a religiously required burial. It may not be in union members' best interest to have such a pool, but the union, whose basic task it is to protect its members' best interests, is forced by the Burial Act to accede to this condition. Furthermore, the state law in effect makes it an unfair practice to withhold interment services when such services are mandated by religious faith to be performed promptly. Again, it is a basic tenet of labor law that resort to self-help measures, such as striking, is a rudimentary component of the federal labor laws.

It is therefore not pivotal that Illinois provided for a fine or that the Burial Act's "appropriate" injunction provision will likely never be used to actually force union laborers to work. Merely making this conduct illegal and providing a remedy is coercion enough. Because an "obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy," Illinois's bid to grant certain plot owners any means of "redress[ing] private wrongs" or of recovering "compensation for past harm" from a labor union for its lawful activity impermissibly regulates matters "subject to the exclusive federal regulatory scheme." *Garmon*, 359 U.S. at 247, 79 S.Ct. at 780. "[T]o allow the State to grant a remedy ... which has been withheld from the National Labor Relations Board only accentuates the danger of conflict" with federal labor law. *Id.*

■ *Garmon* pronounced two exceptions where preemption will not be inferred. Where the activity the state regulates is merely a peripheral concern to federal labor law or where the regulated conduct "touches interests so deeply rooted in local feeling that preemption cannot be inferred absent compelling congressional direction," the federal law will not preempt state regulation. *Illinois Dep't Employment Security*, 988 F.2d at 738; *see Garmon*, 359 U.S. at 243–44, 79 S.Ct. at 778–79. In either situation, the court must balance the state's interest in controlling or remedying the effects of the conduct involved against "both the interference with the National Labor Relations Board's ability to adjudicate controversies committed to it by the [NLRA], and the risk

that the State will sanction conduct that the [NLRA] protects." *Belknap, Inc. v. Hale,* 463 U.S. 491, 498–99, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798 (1983).

The Burial Act was enacted not as a labor regulation, but to provide protection for a class of citizens who may be adversely and uniquely affected by a labor dispute that closes operations at a cemetery. As such, the law addresses interests peripheral to labor law. But Illinois's law is specifically tied to a labor issue; indeed, the Burial Act was passed in direct response to a specific labor dispute. And there exists little that constitutes a more direct concern to labor law than the ability of unions to strike or withhold primary services, or that is a more direct concern to labor law than the collective bargaining process. Thus, although the substantive concern may be peripheral, the Burial Act's remedial arm is aimed directly at the relationship between labor and management and at labor disputes posing a threat to religiously required prompt burials.

■ ■ As to the local feeling exception, regulations found to involve activities deeply rooted in local feeling that do not interfere with federal labor law to such an extent for them to be held preempted include breach of contract and misrepresentation actions by strike replacements, *Belknap,* 463 U.S. at 511–12, 103 S.Ct. at 3183–84, state trespass actions, *Sears,* 436 U.S. at 207–08, 98 S.Ct. at 1762–63, and state tort remedies for intentional infliction of emotional distress, *Farmer v. United Brotherhood of Carpenters & Joiners,* 430 U.S. 290, 305, 97 S.Ct. 1056, 1066, 51 L.Ed.2d 338 (1977), and defamation, *Linn v. United Plant Guard Workers,* 383 U.S. 53, 55, 86 S.Ct. 657, 659, 15 L.Ed.2d 582 (1966). *But see Mitchell v. Pepsi–Cola Bottlers, Inc.,* 772 F.2d 342, 346–47 (7th Cir.1985) (Illinois claim for tortious termination of employment preempted), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986). Additionally, states can grant compensation for or enjoin the consequences of conduct marked by violence and imminent threats to the public order. *Garmon,* 359 U.S. at 247, 79 S.Ct. at 780. (citing *International Union, United Auto., Aircraft & Agricultural Implement Workers v. Russell,* 356 U.S. 634, 78 S.Ct.

932, 2 L.Ed.2d 1030 (1958); *Youngdahl v. Rainfair, Inc.,* 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957); *United Auto., Aircraft and Agricultural Implement Workers v. Wisconsin Employment Relations Bd.,* 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162 (1956); *United Constr. Workers v. Laburnum Constr. Corp.,* 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954)).

■ In the present case, on the other hand, there is no legitimate health or safety-related reason advanced for interring the remains of decedents immediately after death. Instead, defendants maintain that the Burial Act protects four state interests: the right to free exercise of religion, the property right to a burial lot, the right to "burial with dignity," and protection against infliction of emotional distress. Beyond the contention of the free exercise of religion, any such argument is undermined by the fact that the Burial Act does not provide the same protection for all Illinois citizens but only to those professing a religious reason. The defendants themselves assert that the "State of Illinois enacted the Burial Rights Act to ensure the free exercise of religion in Illinois through ... the creation of an ongoing framework for cooperation between the unions and cemetery authorities." Def.'s Memo. in Opposition to Pltf.'s Motion for Summary Judgement, at 30. Also, § 2.2 of the Burial Act states only that the act applies "to burials required in a timely manner consistent with religious tenets and beliefs...." The statute does not read "consistent with property rights or burial with dignity rights," or any other interest the defendants advance to support the Burial Act. Religion, however, is not necessarily a matter for state involvement, *cf. Lee v. Weisman,* —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); *Thornton v. Caldor,* 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985), and therefore cannot be included among the circumstances enumerated above that have been found to be deeply rooted.

■ Even were the court to accept defendants' position that religious freedom is a deeply rooted state interest, that position would not save the Burial Act. Where state claims are substantially dependent upon an

analysis of the terms of an agreement between parties in a labor contract—as an action brought under the Burial Act would be in its bad faith requirement—preemption is likely. *See National Metalcrafters v. McNeil,* 784 F.2d 817, 823–24 (7th Cir.1986); *see also Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *Gibson v. AT & T Technologies, Inc.,* 782 F.2d 686 (7th Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). Moreover, the two *Garmon* exceptions depend on the strength of the underlying claim that the NLRA protects the conduct in question. Thus, state regulation in the areas addressed above is permissible only because the activities regulated by the states in those cases were not themselves actually protected by federal labor law. State regulation of unprotected activities poses little risk of treatment inconsistent with federal law, and this minimal risk is outweighed by the states' deeply rooted interests in exercising their police powers. Where the NLRA likely or actually protects activity, however, "it might be reasonable to infer that Congress preferred the cost inherent in a jurisdictional hiatus to the frustration of national labor policy which might accompany the exercise of state jurisdiction." *Sears,* 436 U.S. at 203, 98 S.Ct. at 1760. In *Sears,* for instance, the Court stated, "experience ... teaches that [situations in which trespasses would be found protected] are rare and ... a trespass is far more likely to be unprotected than protected." *Id.* at 205, 98 S.Ct. at 1761. Accordingly, the state trespass law's application during a union strike did not interfere with federal policy. *See also Belknap,* 463 U.S. at 510–12, 103 S.Ct. at 3183–84 (breach of contract and misrepresentation action by fired strike replacements).

■■■■ But because § 7 of the NLRA does protect the conduct *sub judice,* the risk of inconsistent treatment in the present case is significant. The heart of the economic weapons the Burial Act regulates is the right to strike or withhold services and the right to bargain collectively. Not only are these permitted activities, they are protected activities which remain at the core of federal labor law. As illustrated in the discussion above, where labor activity that is permitted, but not likely protected, conflicts with the rights of third parties who are not a direct part of the labor-management dispute, the burden upon federal labor law of a state regulation protecting the legal rights of third parties may be minimal enough to justify limited state jurisdiction of a cause of action. *See Belknap,* 463 U.S. at 512, 103 S.Ct. at 3184. Where, however, the activity regulated is expressly protected and governed by specific federal rules, direct state regulations that establish additional, local conditions threaten to upset the sensitive balance established by federal labor law. *Brown,* 468 U.S. at 503, 104 S.Ct. at 3186. Federal law must therefore prevail in the present case because the Burial Act sanctions conduct protected by federal labor law and establishes additional conditions on labor rights of union members.

## II. *Machinists* Preemption.

■■■ The second preemption doctrine touching on the issues present before the court is the one articulated in *Machinists.* Under *Machinists* preemption, states are prohibited from interfering with policies which are implicated by the structure of the federal labor laws by regulating conduct Congress intended to be left unregulated, *Machinists,* 427 U.S. at 140, 96 S.Ct. at 2553; *see Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 749, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728 (1985), and by regulating conduct that is to remain a part of the self-help remedies left the combatants in labor disputes, *Machinists,* 427 U.S. at 147–48, 96 S.Ct. at 2556–57. For instance, some activities of unions or employers are neither protected nor prohibited, but were intended to be left to the free-play of the economic system. It is plaintiffs' position that *Machinists* preemption is involved because the circumstances surrounding workers' strikes and the provision of replacements during strikes are matters unquestionably left to the free bargaining between labor and management.

The court agrees. The State of Illinois is regulating an aspect of labor that is left unregulated by the NLRA insofar as Congress intends striking and bargaining to proceed unhampered by regulations and intends for the NLRA to provide the proper balance

of power between employers and employees. As between the Union and the cemetery defendants, the Burial Act impermissibly tilts the balance of economic power in favor of the cemetery defendants. The Union loses the effectiveness of its ability to exert economic power through striking, and accordingly, it loses the power to negotiate favorable contract terms for the employees it represents.

■ *Machinists* establishes as well that state regulations indirectly imposing additional burdens on economic weapons such as strikes or lockouts are preempted, unless the state regulations were contemplated by Congress. *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614–15, 618, 106 S.Ct. 1395, 1398–99, 1400, 89 L.Ed.2d 616 (1986). Accordingly, in *New York Telephone Co. v. New York State Department of Labor*, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (plurality), the Court determined that mental health care benefits and unemployment compensation provided to striking employees, although shifting the economic balance in favor of employees, was a regulation Congress contemplated to remain in the state authority. *Id.* at 531–32, 544, 99 S.Ct. at 1336, 1343 (plurality); *id.* at 547, 549, 99 S.Ct. at 1344, 1345 (Blackmun, J. and Marshall, J., concurring). Conflict existed between state and federal law because the provision of unemployment compensation to striking employees increased the willingness of striking workers to remain on strike. Because the law also increased the employer's costs during a strike through increased employer contributions to the unemployment system, the prolonged lasting-power of the strikers would work to the detriment of employers. But the court determined this was a conflict Congress intended to be endured by the federal system because Congress intended to allow states to implement an unemployment system regardless of its impact on the balance of bargaining power. *Id.* at 544–46, 99 S.Ct. at 1343–44; *see also Baker v. General Motors, Corp.*, 478 U.S. 621, 637–38, 106 S.Ct. 3129, 3138, 92 L.Ed.2d 504 (1986) (state law disqualifying from unemployment compensation employees who finance a strike that causes their unemployment is not preempted). The defendants, however, have failed to point to any evidence indicating that

Congress specifically intended the conduct at issue in this case to be regulated by the states.

The plaintiffs illustrate the shift in power effectuated by the Burial Act. The cemeteries can lock-out Union employees to coerce them through unemployment to accept unattractive contract demands. The cemeteries, on the other hand, would have at their disposal a labor pool ready to perform religiously required burials as is mandated by the Burial Act. As a result, the cemeteries retain the ability to perform burials for a certain number of its customers. Those cemeteries whose patrons are nearly exclusively Jewish will experience little or no economic pressure to resume employment of the striking workers. In effect, the cemeteries can hold out until the striking members succumb to their demands—however unreasonable the demands may be.

■■ Additionally, the Union may prefer to engage in a partial or intermittent strike to accomplish its objectives. For example, the Union could refuse to perform interment services while accepting other tasks to perform. Because this conduct is not protected by § 7, the employer may choose to discipline the Union for this activity. *See NLRB v. Blades Mfg. Corp.*, 344 F.2d 998 (8th Cir.1965); 2 The Developing Labor Law, The Board, the Courts, and the National Labor Relations Act 1112 (Patrick Hardin et al. eds., 3d ed. 1992). Nonetheless, not even the National Labor Relations Board can restrict these economic weapons. *See American Ship Bldg Co. v. NLRB*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) (NLRB cannot restrict employer lockouts); *NLRB. v. Insurance Agents, Int'l Union*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960) (union quickie strikes). The Burial Act, however, provides a remedy even against a union whose partial strike as illustrated above delays religious burials. Because partial strikes are neither protected nor forbidden by federal labor law, and the states possess no more authority to upset the balance of power between employers and unions than does the National Labor Relations Board, state regulation of this ac-

tivity is preempted. *See Machinists,* 427 U.S. at 149, 96 S.Ct. at 2557 (concerted refusal to work overtime); *Teamsters, Chauffeurs & Helpers Union v. Morton,* 377 U.S. 252, 259–60, 84 S.Ct. 1253, 1258, 12 L.Ed.2d 280 (1964) (Ohio law making it illegal for union to solicit employers' customers in order to persuade them to stop renting employers' trucks during labor dispute preempted). The Burial Act, thus, restricts the effectiveness of the overall economic weapons available to unions.

 More importantly, because the Burial Act mandates agreement on the substantive terms of collective bargaining agreements, the bargaining process between the Union and defendant cemeteries is nearly eliminated altogether. States cannot enter into the substantive aspects of the bargaining process. *Golden State,* 475 U.S. at 615–16, 106 S.Ct. at 1399. It cannot be overemphasized that national labor law "requires an employer and a union to bargain in good faith, but it does not require them to reach agreement." *Id.* at 616, 106 S.Ct. at 1399; *compare International Brotherhood of Teamsters, Local 24 v. Oliver,* 358 U.S. 283, 295–97, 79 S.Ct. 297, 304–05, 3 L.Ed.2d 312 (1959) (federal law preempts application of Ohio's antitrust law to collective bargaining agreement involving minimum truck lease rate for independent truckers; because a wage rate is mandatory subject of bargaining, state laws cannot interfere with or limit range of solutions the parties could negotiate) *with Washington State Nurses Ass'n v. Washington State Hosp. Comm'n,* 773 F.2d 1044, 1047 (9th Cir.1985) (commission practices not preempted where commission's use of wage guidelines and urgings to reduce hospital costs did not impose sanctions on union or employer with respect to collective bargaining negotiations and did not invalidate an actual negotiated scale), *cert. denied,* 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986); *see also* 29 U.S.C. § 158(d) (obligation to bargain collectively "does not compel either party to agree to a proposal or require the making of a concession").

 Defendants argue that the Supreme Court has held that state-mandated bargaining arrangements are not unconstitutional when the public interest is involved, citing

*Associated Builders,* —— U.S. ——, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). The defendants' "public interest" position, however, is a significant misunderstanding of the *Associated Builders* decision. That case involved a state authority, acting as the owner of a construction project, enforcing an otherwise lawful prehire collective bargaining agreement negotiated by private parties. As such, the case stands solely for the proposition that a state is not subject to preemption where the state is acting as a proprietor instead of as a regulator. *Id.* at ——, 113 S.Ct. at 1196. "When a state owns and manages property, for example, it must interact with private participants in the marketplace." *Id.* Thus, "to the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same." *Id.* at ——, 113 S.Ct. at 1198 (emphasis in original). Acting as a proprietor is not tantamount to regulation or policymaking. *Id.* at ——, 113 S.Ct. at 1197. If the state had passed a law requiring all parties involved in the construction industry to enter into prehire agreements, a very different case would have been presented.

Defendants further attempt to justify the Burial Act by stating that the labor pool agreement "would merely be a supplemental agreement to the main negotiations, made in the public interest, with no measurable effect ... on Plaintiffs' present ability to harbor ... economic weapons of self-help." That the unions and cemeteries are forced to agree on terms incorporated in a agreement separate from the collective bargaining agreement itself is of no moment. If the state cannot force agreement on a term in collective bargaining agreements, that a term is removed from collective bargaining and placed in a separate document does not change the invasiveness of the state's intrusion into the collective bargaining process. Contract terms that are not mandatory subjects of bargaining are left to the free-play of the economic system.

 Nevertheless, the case law suggests that state laws of general application affecting terms of collective bargaining are

not automatically preempted. A court must determine the impact of federal law on state law " 'in light of the wider contours of federal labor policy.' " *Metropolitan Life*, 471 U.S. at 753, 105 S.Ct. at 2396 (quoting *Belknap*, 463 U.S. at 520 n. 4, 103 S.Ct. at 3188 n. 4 (Blackmun, J., concurring)). Because the NLRA is concerned with equitable bargaining processes, *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20, 107 S.Ct. 2211, 2222, 96 L.Ed.2d 1 (1987), many state regulations of general application do not interfere with this federal policy because they affect union and nonunion employees equally and they do not encourage or discourage collective bargaining. *Metropolitan Life*, 471 U.S. at 755, 105 S.Ct. at 2397. Furthermore, these laws may only have an indirect effect on self-organization policies. *Id.* As a result, state laws establishing minimum labor standards, for instance, do not undercut collective bargaining and survive preemption. *Id.* To the extent the defendants' argument can be read as being that the Burial Act is general in applicability and has no measurable effect on plaintiffs' ability to bargain collectively, the court will address this inquiry.

Unlike the regulations involved in *Metropolitan Life*, the Burial Act does not affect union and nonunion employees equally and has a great impact on the ability of unions to bargain collectively. Importantly, the Burial Act directly and substantially affects interests implicated in the NLRA. The Burial Act's mandate requiring the formation of a replacement labor pool for the purposes of performing religiously required burials during the duration of a strike does not form a neutral backdrop upon which unions can bargain. *See Fort Halifax*, 482 U.S. at 20–21, 107 S.Ct. at 2222 (state statute mandating severance pay for employees whose employers have relocated is not preempted because neutral). On the contrary, the Burial Act provides a hostile backdrop to fair and equal bargaining between the Union and defendant cemeteries. As such, for the state to mandate agreement on a substantive term affecting the federal labor self-help rights of management and labor is an impermissible intrusion into the collective bargaining process itself. Not only is collective bargaining discouraged, it is eliminated altogether.

In sum, Illinois does not possess authority to influence the substantive terms of collective bargaining agreements as it has attempted to do in the present case. The impact of the Burial Act—which regulates the content of collective bargaining agreements as well as the duties of striking workers—upon the administration of national labor policy is far too great. It is an unpermitted means of accomplishing the state's objectives for the Burial Act to condition a labor strike on the existence of a replacement labor pool, to provide a fine for the failure of a collective bargaining agreement to reflect this labor pool, or to force striking workers to perform certain burials while they are on strike. To permit the State of Illinois to provide third parties with a remedy that federal law prohibits an employer from utilizing would frustrate the federal regulatory scheme. Public concern is notably high, but it is not in the state's right to interfere with the bargaining process. Federal labor law emphatically leaves these issues to the free-play of the economic system. Accordingly, it is not only clear from the totality of circumstances that Congress intended to occupy the collective bargaining process and striking to the exclusion of the states, and intended to provide the sole conditions upon which these rights are to be exercised, but it is also clear that the Burial Act conflicts with the federal regulatory scheme significantly. The court finds the Burial Act's provisions requiring unions and cemeteries to negotiate a replacement labor pool and allowing for an injunction and fine to issue against a labor union during a strike are preempted.

### CONCLUSION

For reasons stated above, the plaintiffs' motion for summary judgment is granted and the defendants' motion is denied. The Illinois Burial Rights Act, P.A. 87–1174 is preempted by the NLRA, as amended, and as such violates the Supremacy Clause of the United States Constitution, U.S. CONST., art. VI, cl. 2.

IT IS SO ORDERED.